554 So.2d 336 (1988)
Ex parte Michael Leon McCREE.
(Re Michael Leon McCree v. State of Alabama).
87-353.
Supreme Court of Alabama.
September 16, 1988.
Rehearing Denied November 18, 1988.
Rick Harris and Stephen R. Glassroth of Moore, Kendrick, Glassroth, Harris & White, Montgomery, for petitioner.
Don Siegelman, Atty. Gen., and Jean Williams Brown, Asst. Atty. Gen., for respondent.
JONES, Justice.
The petitioner, Michael Leon McCree, was convicted for manslaughter and was sentenced to 10 years in prison under Alabama's firearms enhancement statute (Ala. Code 1975, § 13A-5-6(a)(5)).[1]

FACTS
Because the Court of Criminal Appeals affirmed without an opinion, 519 So.2d 1385 (1987), McCree's "Request for Statement of Additional Facts," pursuant to Rule 39(k), A.R.A.P., is substantially reproduced below as the statement of facts (we have checked the petitioner's Rule 39(k) statement of additional facts against the record and find it to be correct in all material aspects):
"On Wednesday, November 27, 1985, James Groomster suffered a gunshot wound to the head that ultimately resulted in his death. McCree was convicted *337 of manslaughter for the death of Groomster.
"McCree testified in his case and gave a detailed and almost entirely undisputed account of the events of the day. At the time of the shooting, McCree was employed by the Montgomery Police Department as a police officer, and had been since March, 1983. Also at the time of the shooting, he was employed as a part-time security guard at the Hardee's fast food restaurant on Fairview Avenue in Montgomery. He worked there, in addition to his full-time police work, some 20 to 25 hours per week. The second job was fully authorized by the city....
"McCree carried a city-issued .357 magnum pistol while on duty as a police officer and while working as a uniformed security guard at Hardee's. When not in uniform, he carried his personal weapon, a .25 Raven automatic, worth approximately eighty dollars. McCree testified that he needed the weapon for personal protection and because, as a police officer, he was on duty twenty-four hours a day. He stated he could not afford a more expensive personal weapon, and that many police officers also carried inexpensive personal weapons. State firearms expert Lonnie Harden testified that the pistol fit within the category `Saturday Night Special,' that it lacked many of the safety features of more expensive weapons, that many police officers carry personal weapons without such safety features, and that many officers carry such personal weapons because it is all they can afford.
"McCree and Groomster had met while both were employed at Hardee's restaurant, Groomster as a cook and McCree as a security guard. McCree testified that they became best friends, and this was not disputed by any witnesses. State's witness O'Nell Latimore, who also worked at Hardee's, agreed that the pair were best friends.
"On the day in question, McCree and Groomster met just before 3 p.m., having planned to spend the day together and celebrate the upcoming holidays (the incident occurred on the Wednesday before Thanksgiving). McCree testified that throughout the day, after they left Hardee's, he and Groomster had been drinking Jack Daniel whiskey. Their first stop after Hardee's was McCree's home, where McCree took a shower. They also spent time that day with Charlie Powell and Edmund Edoziem, who also were McCree's friends. During the day the four went to the State liquor store [and then] returned to McCree's house, where they remained until approximately 7 p.m. They next went to a gas station, and then to Edoziem's apartment.
"McCree had purposely left his pistol at home before the trip to the State liquor store, but Groomster picked up the weapon and brought it along. When returning to his house from the liquor store, McCree left the pistol in his car, but it was retrieved by Groomster. McCree left his pistol home before the trip to Edoziem's residence, but it was again carried along on the trip by Groomster. McCree left the weapon in the car before going upstairs to Edoziem's apartment, but Groomster brought the pistol with him.
"McCree did not check to see if a round was in the chamber before handling the pistol because it was his habit never to keep a round in the chamber. While in Edoziem's apartment, Groomster asked McCree to show him the features of the pistol. While looking at the front and rear sights of the pistol, Groomster bent forward toward the front sights, and grabbed the pistol. It discharged, wounding Groomster in the head.
"McCree does not keep a round in the chamber of his pistol and could only explain its having been loaded by noting that Groomster had handled the pistol on several occasions before the incident. After the shooting, McCree told the other two friends at the apartment to call the paramedics and the police. He then went immediately to his home to tell his wife what had happened, and to return with her to the scene, stating he was *338 afraid she would become hysterical. [McCree testified at trial that he based his fear for his wife's emotional reaction on her previous inability to handle a situation in which he had been injured.]
"Shortly after he went home, McCree returned with his wife to the scene, and identified himself to Investigator Davis, a police officer who had arrived to investigate the shooting. McCree was placed in custody, and was taken to the Montgomery County Sheriff's Department for questioning.
"Investigator Davis arrived at the scene of the crime at approximately 7:45 p.m. on November 27, 1985. When he arrived, a patrol unit was already present, protecting the scene. The officers there advised Investigator Davis that there had been two witnesses to the incident. At approximately 8 p.m., McCree arrived on the scene. He told Investigator Davis, `I'm the one you're looking for.' Investigator Davis led McCree into the bedroom and advised him of his rights. At the time he took McCree into custody, Investigator Davis had no idea whether the shooting was an accident or a criminal act, but he nevertheless placed McCree under arrest, as is shown by the following testimony elicited from Investigator Davis:
"Q. Investigator Davis, when you advised Mr. McCree of his constitutional rights, was he free to go at that point?
"A. No, he was not.
"Q. He was under detention by you?
"A. Yes, he was.
"Q. And at that time, did you have any reason to believe that this shooting was anything other than an accident?
"A. I could only tell you from what he had told me, that it was an accident.
"Q. Well, the witnesses you interviewed both said it was an accident, didn't they?
"A. That's correct.
"Q. Did anybody tell you anything different other than it was an accident?
"A. Well, sir, I did not investigate the crime so I could not tell you. I can only tell you what I was told.
"Q. You don't know whether it was an accident? You didn't know at that point whether it was an accident or not?
"A. That's correct.
"Q. And was there anything in the crime scene that led you to believe that it was not an accident?
"A. No, it did not.
"After being questioned while in custody, McCree gave a statement, which was videotaped and transcribed and later received into evidence. McCree cooperated with the investigation, and no witnesses testified that he tried to obstruct the investigation or that he was uncooperative in any way.
"McCree had received standard firearms safety training while attending the Montgomery Police Academy, and was aware of the rule of firearms safety which requires those handling firearms to always check a weapon for bullets before handling it. The state's firearms expert, Lonnie Harden, found nothing inconsistent with McCree's version of events and testified that the shooting could very well have happened that way."

ISSUE
McCree was convicted of manslaughter, a Class C felony, pursuant to § 13A-6-3(a)(1)[2]: "A person commits the crime of manslaughter if he recklessly causes the death of another person."
We granted the petition to review the decision of the Court of Criminal Appeals regarding the issue of the propriety of sentencing McCree pursuant to Ala.Code 1975, § 13A-5-6 (specifically, § 13A-5-6(a)(5), which, along with subsection *339 (a)(4), was added by amendment in 1981). Section 13A-5-6(a) reads:
"(a) Sentences for felonies shall be for a definite term of imprisonment, which imprisonment includes hard labor, within the following limitations:
"(1) For a Class A felony, for life or not more than 99 years or less than 10 years.
"(2) For a Class B felony, not more than 20 years or less than 2 years.
"(3) For a Class C felony, not more than 10 years or less than 1 year and 1 day.
"(4) For a Class A felony in which a firearm or deadly weapon was used or attempted to be used in the commission of the felony, not less than 20 years.
"(5) For a Class B or C felony in which a firearm or deadly weapon was used or attempted to be used in the commission of the felony, not less than 10 years."
McCree argues that subsections (4) and (5), which enhance the sentence for the commission of a felony involving the use of a firearm or deadly weapon, apply only to the sentencing of those defendants found guilty of a felony whose commission required an intent to use or to attempt to use a weapon in the furtherance of the offense.
Section 13A-2-2 sets out the definitions of "culpable mental states":
"The following definitions apply to this Criminal Code:
"(1) INTENTIONALLY. A person acts intentionally with respect to a result or to conduct described by a statute defining an offense, when his purpose is to cause that result or to engage in that conduct.
"(2) KNOWINGLY. A person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of that nature or that the circumstance exists.
"(3) RECKLESSLY. A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates a risk but is unaware thereof solely by reason of voluntary intoxication, as defined in subdivision (e)(2) of section 13A-3-2, acts recklessly with respect thereto.
"(4) CRIMINAL NEGLIGENCE. A person acts with criminal negligence with respect to a result or to a circumstance which is defined by statute as an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation. A court or jury may consider statutes or ordinances regulating the defendant's conduct as bearing upon the question of criminal negligence."
McCree advances two arguments in support of his contention that the trial court erred in applying the enhancement provision of § 13A-5-6(a)(5) to the computation of McCree's sentence. First, says McCree, the language of § 13A-5-6(a)(5) allows enhancement of a sentence only when a defendant is convicted of a felony that involves the use or the attempt to use a weapon "in the commission of [that] felony." McCree contends:
"This language [of § 13A-5-6(a)(5) ] can only mean that the firearm or deadly weapon was used to further the commission of the felony, and use of a weapon in the furtherance of the commission of the felony requires a deliberate use of the weapon to further the commission of the felony."
McCree next argues that the element of intent is a necessary element of any felony to which the enhancement statute is sought *340 to be applied in order for the statute to have a deterrent effect on the use of weapons, especially firearms, in the commission of a felony. McCree further contends:
"The purpose of requiring a mandatory minimum sentence when a firearm is used is an effort by the legislature to protect the public from physical injury and death at the hands of violent criminals, whether the felony be Class B or Class C. It is a warning to potential criminals that they face a severe and fixed sentence if they use a firearm under these conditions. It is also intended to remove dangerous criminals from society during a substantial period for the protection of society."
Rocker v. State, 443 So.2d 1316, 1321-22 (Ala.Crim.App.1983) (emphasis supplied by McCree's brief in support of petition).
The stated purpose of subsections (4) and (5), says McCree, can not be accomplished unless intent is an element of the felony to which those subsections are applied. There is no protection from violent criminals, no warning to potential criminals not to use firearms in the commission of a felony, and no removal of dangerous criminals from society if the enhancement statute is applied to felonies where the underlying mental state is mere recklessness instead of intent to use a firearm to further the commission of a felony.
The State, relying on Holloway v. State, 477 So.2d 487 (Ala.Crim.App.1985), maintains that the application of § 13A-5-6(a)(5) is mandatory, the only requirement for its application being that the jury find that the defendant used a firearm in the commission of a Class B or Class C felony.
In Holloway, the defendant, convicted of manslaughter, maintained that § 13A-5-6(a)(5) was improperly applied to his sentence because the evidence at trial established that the victim initiated the use of the weapon. The defendant testified that the victim went into another room and returned with a rifle, demanding that the defendant leave. The defendant attempted to take the rifle from the victim and they fought over possession of it. During the fight, the rifle discharged, wounding the defendant and killing the victim.
The Court of Criminal Appeals, in Holloway, affirmed the trial court's application of § 13A-5-6(a)(5), and held:
"[Section 13A-5-6(a)(5) ] is mandatory and its application does not hinge on whether or not the perpetrator owned the weapon or brought it to the scene of the crime. The only requirement for application of § 13A-5-6(a)(5) is that the jury must find that the defendant used a firearm or deadly weapon in the commission of a Class B or C felony. The jury in the instant case found that the [defendant] was guilty of manslaughter because he caused the death of the victim by shooting her with a .22 caliber rifle. Manslaughter is a Class C felony. Alabama Code § 13A-6-3(b). Due to the jury's finding that the [defendant] had committed a Class C felony with the use of a firearm, the trial court had no alternative but to sentence the [defendant] in accordance with § 13A-5-6(a)(5)."
477 So.2d at 488-89.
The State argues that Holloway clearly establishes that the only requirement for the application of § 13A-5-6(a)(5) to the petitioner is that he used a firearm in the commission of this Class C felony and, thus, that the Court of Criminal Appeals' judgment of affirmance of McCree's enhanced punishment is due to be affirmed. We disagree.
Contrary to the holding in Holloway that "the only requirement for application of § 13A-5-6(a)(5) is that the jury must find that the defendant used a firearm in the commission of a Class B or C felony," the resolution of this issue requires a two-step process. First, implicit in the language of § 13A-5-6(a)(5)"a firearm or deadly weapon was used or attempted to be used in the commission of the felony"is the requirement that the underlying felony for which the defendant is convicted have, as one of its necessary elements, the element of intentional criminal conduct. Therefore, McCree's reckless or negligent conduct, which resulted in manslaughter, while sufficient to supply *341 the criminal scienter to support a conviction for a Class C felony, does not require a finding that he intentionally used the firearm to commit the felony, and thus can not support the application of § 13A-5-6(a)(5). In other words, reading § 13A-5-6 as a whole, we must construe subsection (a)(5) to mean that convictions for those underlying felonies that are committed without the intentional use of a deadly weapon do not fall within the category of convictions that invoke the enhancement provision of this statute.
Second, "enhancement," as that word is used to describe the effect of § 13A-5-6(a)(5),[3] necessarily means that in addition to the culpability of the offense for which the defendant has been convicted, the defendant's conduct is necessarily the result of a higher degree of culpability, because of the jury's finding that a "firearm or deadly weapon was used or attempted to be used in the commission of the felony." Indeed, the use of a deadly weapon to commit the underlying felony is the classic situation intended by the legislature to invoke the enhanced penalty.
Here, the jury returned a verdict of manslaughter. By virtue of that finding, that McCree recklessly caused the death of his friend, the jury eliminated the element of McCree's intentional use of a firearm as a means to take human life. The culpability of McCree for recklessness was established by the jury's verdict. Otherwise, the guilty verdict would have reflected a higher degree of unlawful homicide. (Indeed, the indictment specifically charged McCree with manslaughter under § 13A-6-3(a)(1) and not with a higher degree of criminal culpability.) Therefore, the trial court was without authority to sentence McCree under an enhancement statute that, by its terms, is invoked only by a degree of culpability higher than that for which McCree had been found guilty.

CONCLUSION
Whether every manslaughter conviction would require the same holding as here (the inapplicability of § 13A-5-6(a)(5)), we need not decide. But, under the facts of the instant case, the jury's verdict of manslaughter (pursuant to § 13A-6-3(a)(1)) necessarily precluded any finding that McCree possessed the requisite intent to use his firearm in the commission of the felony with which he was charged and convicted. Therefore, McCree's conviction of manslaughter, under the totality of the circumstances, failed to invoke the application of the enhancement provisions of § 13A-5-6(a)(5).
We hold that the Court of Criminal Appeals erred in affirming the trial court's use of § 13A-5-6(a)(5) in sentencing McCree. Therefore, its judgment is reversed, and this cause is remanded to the Court of Criminal Appeals for the entry of an order consistent with this opinion.
Further, our review of the facts in Holloway, supra, and of the Court of Criminal Appeals' decision in that case, brings us to the same conclusion as that reached in the instant appeal. Therefore, the case of Holloway v. State, 477 So.2d 487 (Ala.Crim. App.1985), to the extent that it is in conflict with this opinion, is hereby overruled.
REVERSED AND REMANDED.
SHORES, ADAMS and STEAGALL, JJ., concur.
ALMON, J., concurs in the result.
TORBERT, C.J., and MADDOX and BEATTY, JJ., dissent.
MADDOX, Justice (dissenting).
I believe that the legislature intended what the statute says: "[I]n a Class B or Class C felony in which a firearm is used or attempted to be used in the commission of a felony, [the sentence shall be] not less than 10 years." (Emphasis added.) The legislature intended to establish a minimum sentence in every case where a firearm is used, or attempted to be used, in the commission of a Class B or C felony. The *342 culpability of the defendant in committing the offense only applies to the guilt phase of the trial, and whether the felony is classified as either a Class A, Class B, or Class C felony. I agree with the decision of the Court of Criminal Appeals in Holloway v. State, 477 So.2d 487 (Ala.Crim.App. 1985), that "[t]he only requirement for application of § 13A-5-6(a)(5) is that the jury find that the defendant used a firearm or deadly weapon in the commission of a Class B or C felony." (Emphasis added.)
The effect of this opinion could be to eliminate the minimum sentence provision of § 13A-5-6(a)(5) in most cases involving Class B or C felonies, because many of these felonies do not require that the crime be committed "intentionally." Based on the foregoing, I must respectfully dissent.
TORBERT, C.J., concurs.
NOTES
[1] The petitioner served the trial court with a written motion to bar the use of the enhancement provisions in determining his sentence. The trial court denied the motion in open court.
[2] Although not applicable to the instant case, § 13A-6-3(b) was amended, effective August 12, 1987, to substitute "Class B felony" for "Class C felony." See, also, "Code Commissioner's note" to § 13A-6-3, as amended.
[3] Although the drafters of § 13A-5-6(a)(5) and (6) did not use the word, it is apparent from a careful reading of those subsections, within the context of the entire section, that they were intended as "enhancement" provisions.