Tyrone Winston Robinson was charged in a two-count indictment with the murder of his wife, Lucinda Robinson, and the murder of Kenneth Simpson. A jury found him guilty as charged in the death of Lucinda Robinson, but convicted him of the lesser included offense of manslaughter in the death of Kenneth Simpson. Robinson was subsequently sentenced to 30 years' imprisonment on the murder conviction and to 10 year's imprisonment on the manslaughter conviction, with the sentences to run consecutively.
 I
Robinson asserts that statements which he made at the scene in response to police questioning were inadmissible because he was not advised of his rights under Miranda[1] prior to making those statements. *Page 912 
Shortly after 11:00 p.m. on the night of March 17, 1988, four Birmingham police officers responded to a radio call of "burglary in progress" or "burglar shot" at the defendant's residence. Officer DeWayne Stanley and his partner arrived at the house almost simultaneously with Officers Tommy Tanner and Phillip Holbert. The four officers cautiously approached the front door, which was open slightly. Once inside, the officers found a black male lying on the floor just inside the door. The defendant "came up the stairs with a badge in his hand" and said, "I'm a deputy, and I shot him." One officer also heard him say, "I don't know what he was doing in my house." Officer Tanner asked the defendant where the gun was, and the defendant lead him into the kitchen, where Tanner observed a gun. While in the kitchen with Tanner, the defendant said his wife was downstairs. Some 20 or 30 seconds later the defendant told Tanner that "his wife had been shot also." The paramedics had arrived by this time, and Tanner sent someone downstairs to check on the defendant's wife.
Meanwhile, Officer Holbert was attending Kenneth Simpson, the man on the floor. When Holbert entered the house, Simpson was struggling to get up. Holbert patted him down, then asked him his name and age. Holbert heard someone say, "There's a lady downstairs" and asked Simpson if he knew who this lady was. Simpson replied that she was his sister-in-law. Simpson was treated by paramedics at the scene, then transported to University Hospital where he died the next morning at 5:32 a.m.
The defendant's wife, Lucinda Robinson, was dead when the paramedics reached her. One of the officers relayed this information to Officer Tanner. At that time, Tanner and the defendant moved from the kitchen to the dining room. The defendant then said that he would like to check on his child and went upstairs alone.
Prior to making their report and leaving the scene, Officers Stanley and Tanner went upstairs where Stanley asked the defendant "to go over the story just to make sure we had it right." Stanley testified that, at this time, the defendant said:
 "[H]im and his wife was downstairs washing. And he started up the basement steps and he heard some footsteps coming down the main stairs upstairs. He said he could tell by the weight that it wasn't his daughter. So he run to the kitchen to get his gun. And as he was coming back into the hall he said he saw a black flash run from the main stairs towards the front door. He had hollered halt, and the guy didn't stop, so he shot. He said he didn't know how many times he shot. At that time his wife was coming up the stairs and he didn't know it. And she said, oh, you shot Ken. And it startled him, and he rolled around, and the gun went off."
It is this statement that the defendant contends was erroneously admitted. Clearly, no Miranda warnings were given before this statement was obtained. However, "Miranda does not apply to traditional investigatory functions such as general on-the-scene questioning." Smithv. State, 515 So.2d 149, 152 (Ala.Cr.App. 1987).Accord, Bui v. State, 551 So.2d 1094, 1108
(Ala.Cr.App. 1988), affirmed, 551 So.2d 1125 (Ala. 1989);Hubbard v. State, 500 So.2d 1204, 1224 (Ala.Cr.App.), affirmed, 500 So.2d 1231 (Ala. 1986), cert. denied,480 U.S. 940, 107 S.Ct. 1591, 94 L.Ed.2d 780 (1987).
 "The safeguards set out by the United States Supreme Court in [Miranda] are only applicable when an individual is subjected to custodial interrogation. 'By custodial
interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' Miranda, supra, 384 U.S. at 444, 86 S.Ct. at 1612."
Primm v. State, 473 So.2d 1149, 1158 (Ala.Cr.App. 1985). "Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a 'formal arrest or *Page 913 
restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler,463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983). An arrest occurs when a reasonable person in the defendant's position would believe that he is not free to leave.Williams v. State, 527 So.2d 764, 769 (Ala.Cr.App. 1987).
There is nothing in the record before us to indicate that the defendant was "in custody" at the time Officer Stanley asked him to "go over the story." The defendant was obviously not under formal arrest at this time. In fact, during cross-examination of Officer Stanley, defense counsel asked, "You didn't charge him or place him under arrest, Tyrone Robinson, did you?" and Stanley replied that he did not.Compare Ex parte McCree, 554 So.2d 336, 338 (Ala. 1988) (investigator arrived at scene of shooting and placed defendant under arrest having "no idea whether the shooting was an accident or a criminal act"). Nor is there any indication that the defendant's movements had been unduly restricted — he was clearly permitted to go upstairs alone to check on his daughter when he expressed a desire to do so. While the house had been "secured," this was simply to prevent the entry of extraneous or curious persons and the loss of evidence.
It must be remembered that this was the scene of a reported burglary and shooting. While several officers were present, there was no evidence that any of the officers displayed a weapon, touched the defendant in any way, or used any language or a tone of voice that would have required compliance with their requests. "In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure [or arrest] of that person." United States v.Mendenhall, 446 U.S. 544, 555, 100 S.Ct. 1870, 1877,64 L.Ed.2d 497 (1980). Under the circumstances of this case, we do not find that a reasonable person in the defendant's position would have believed that he was not free to leave. Clearly, the statement complained of in this issue was nothing more than a response to general on-the-scene questioning and noMiranda warnings were required.
 II
Robinson contends that the tape-recorded statement he gave on the night of the shootings should have been suppressed because it was obtained after he had invoked his right to counsel.
Sometime after midnight on the night of the shootings, the defendant was transported to a police station where he gave a statement. The tape recording of this statement was apparently transcribed by a police department secretary, although this transcription was not offered at trial. Instead, the tape of the statement was introduced and played before the jury. After the record had been filed with this Court, but prior to the actual submission of this appeal, Robinson filed a motion under Rule 10(f), A.R.A.P., seeking to have the statement transcribed and that transcript made a part of the record on appeal. The State joined in this motion, asserting that "[i]t will be to the benefit of all concerned, including this Court, for [the transcribed statement] to be a part of the record." These motions were granted, and the transcript of the statement is part of the record before this Court.
At the beginning of the transcript, there is a discussion between Sergeant Reynolds and the defendant regarding theMiranda rights. Many of the statements made by the defendant, and some of those by Sergeant Reynolds, are designated only as "inaudible."[2] The defendant testified at the suppression hearing that he "mentioned something about an attorney" to Reynolds "several times." When asked specifically what he had said about a lawyer, the defendant stated, "I believe I said can I talk to one, or can I call a lawyer or talk to one or something." Reynolds testified *Page 914 
that he "unequivocally" did not "recall [the defendant] at any point in any conversation saying those words, 'I want to have a lawyer.' " However, he stated that the defendant said "something about, well, if I'm going to be charged with anything do I need an attorney" and "I don't feel like I've done anything wrong. But, you know, do you think I need an attorney or something to that effect." Reynolds also acknowledged that, at the preliminary hearing, he had testified that, while he did not recall "those specific words," the defendant could have said "if I'm going to be charged with anything, I want to have a lawyer here."
In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966), the Supreme Court established that, under the Fifth Amendment, one has a right to counsel during custodial interrogation. Once the right to counsel has been invoked, police officers may not ask the accused any further questions regarding an alleged crime until the accused has been given an opportunity to confer with counsel or unless the accused himself initiates further contact with the police.Edwards v. Arizona, 451 U.S. 477, 484-85,101 S.Ct. 1880, 1884-85, 68 L.Ed.2d 378 (1981). However, if the accused's assertion of his right to counsel is equivocal or ambiguous, the officers may seek to clarify whether the accused actually desires the presence of counsel. Nash v. Estelle,597 F.2d 513, 517 (5th Cir.) (en banc), cert. denied, 444 U.S. 981,100 S.Ct. 485, 62 L.Ed.2d 409 (1979); Bruni v. Lewis,847 F.2d 561, 563 (9th Cir. 1988), cert. denied, 489 U.S. 1055,109 S.Ct. 1319, 103 L.Ed.2d 587 (1989); see Gray v.State, 507 So.2d 1026, 1030 (Ala.Cr.App. 1987).
 "When a defendant makes an equivocal request for an attorney during a custodial interrogation, 'the scope of that interrogation is immediately narrowed to one subject and one only. Further questioning thereafter must be limited to clarifying that request until it is
clarified.' Thompson v. Wainwright, 601 F.2d 768, 771 (5th Cir. 1979) (emphasis in original); Nash v. Estelle, 597 F.2d 513, 517 (5th Cir.) (en banc), cert. denied, 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979). Any statement taken by the state after the equivocal request for counsel is made, but before it is clarified as an effective waiver of counsel, violates Miranda."
Owen v. Alabama, 849 F.2d 536, 539 (11th Cir. 1988).
In this case, it is abundantly clear that the defendant made at least an equivocal request for counsel. Towne v.Dugger, 899 F.2d 1104 (11th Cir. 1990) (holding that defendant's question to interrogating officer as to whether he (the defendant) needed a lawyer was an equivocal request for counsel). Thus, Reynolds was obligated to cease all questioning except that necessary to establish whether the defendant actually had a present desire for counsel.
We are unable to discern from the record before us the specific point at which the defendant made his equivocal request for counsel or exactly what responses Reynolds may have made to that request. In view of this fact and the fact that this cause must be reversed for the reasons set forth in Part III, we decline, at this time, to make a determination with regard to the admissibility of the taped statement. In the event this cause is retried, the burden is on the prosecution to clearly establish both that Reynolds' statements or questions to the defendant fell within the rule of Thompsonv. Wainwright, 601 F.2d 768 (5th Cir. 1979), and Nashv. Estelle, supra, and that the clarification undertaken by Reynolds confirmed that the defendant actually did not desire the presence of counsel. See United States v.Fouche, 776 F.2d 1398, 1404-05 (9th Cir. 1985). Cf.Miranda, 384 U.S. at 475, 86 S.Ct. at 1628 ("[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel").
 III
The defendant argues that the State failed to lay the proper predicate for the *Page 915 
admission of the taped statement and that the statement contained inadmissible material which was highly prejudicial.
While the defendant objected to the tape at trial on a number of grounds, failure of the State to lay the proper predicate for its admission was not one of the grounds raised. "A defendant is bound by the grounds of objection raised at trial and cannot change them on appeal." Leonard v.State, 551 So.2d 1143, 1151 (Ala.Cr.App. 1989). Moreover, "[t]he statement of specific grounds of objection waives all grounds not specified and the trial court will not be put in error on grounds not assigned at trial." Ex parteFrith, 526 So.2d 880, 882 (Ala. 1987).
We find merit, however, in the defendant's assertion that the tape contained inadmissible and prejudicial material. Throughout the statement, the defendant maintained that his wife was standing at or near the top of the basement steps when he accidentally shot her. In questioning the defendant, Sergeant Reynolds made the following assertions on the tape:
 "That's another problem in that the blood where she bled starts about halfway, at least halfway up the steps. From the physical evidence at the scene I don't think she was anymore than maybe halfway or three-fourths of the way up the steps when she was shot. Because they [sic] know what I'm saying. Your steps go down in a pretty steep angle, almost 45 degrees.
". . . .
 "If she had been standing where the blood indicates that she was, and you turned and you were in the combat position as you've said over and over that you were, we're pretty sure — Ronnie Williams, the Coroner, told us that it appeared that she was standing about probably halfway — her feet were about halfway up the stairs.
". . . .
 "Before I begin again, it's just one physical evidence [sic]. It doesn't match you saying that you turned around in a combat position and shot her at the top of the steps. What it appeared from the scene — of course, well have to, you know, look at the photographs and talk to the Coroner, the deputy coroner, and get their opinion on it — but just from the preliminary investigation at the scene it appears that she was about halfway up the steps, which would have been impossible for a bullet to hit her if you were in the combat position because it would put him [sic] back two or three feet at the least. And those steps are real steep." (Emphasis added.)
As our Supreme Court stated in Crawford v. State,262 Ala. 191, 192, 78 So.2d 291, 292 (1954):
 "The courts of this state have long held that it is not competent for a witness, expert or non-expert, to draw conclusions for the jury, from examination of the body of the deceased and wounds thereon, as to the relative positions of the parties when the fatal shot was fired. This rule has been established for the reason that, having been given the description and characteristics of the wounds, the jury is equally as competent as the witness to judge and decide the location and position of the participants."
Accord, Smith v. State, 466 So.2d 1026, 1034-35
(Ala.Cr.App. 1985). This rule has been applied to witnesses who attempt to testify as to the positions of the participants based on evidence other than an examination of the victim's wound, see Padgett v. State, 49 Ala. App. 130, 136-37,269 So.2d 147, 152-53, cert. denied, 289 Ala. 749,269 So.2d 154 (1972) (trial court erred in permitting officer to testify as to position of defendant when gun was fired based on angle of bullet hole in head board of bed), and the rule is now simply stated that "even an expert may not testify as to the relative positions of the parties before a shot is fired."Sheffield v. State, 392 So.2d 1233, 1237 (Ala.Cr.App. 1980), cert. denied, 392 So.2d 1237 (Ala. 1981). Accord,Bowden v. State, 542 So.2d 335, 340 (Ala.Cr.App. 1989);Uldric v. State, 43 Ala. App. 477, 479, 192 So.2d 736,738, cert. denied, 280 Ala. 718, 192 So.2d 739 (1966). The rationale for this rule is clear: in many cases, e.g., where the defense is accident or *Page 916 
self-defense, the position of the parties at the time of the shooting is an "ultimate issue of fact" to be resolved by the jury as the sole trier of fact. Therefore, a non-eye-witness may testify only as to what he or she saw at the scene or as to the wound[s] examined, from which the jury may then draw its own conclusions as to the positions of the participants. Any testimony by a non-eyewitness as to the positions of the parties invades the province of the jury. See Smith v.State, 466 So.2d at 1035. Cf. C. Gamble,McElroy's Alabama Evidence § 127.01(5) at 269 (3d ed. 1977) ("It has been held traditionally in this country that an expert witness cannot give his opinion upon an ultimate issue in the case. In a will contest, for example, the expert witness physician cannot testify that the testator was or was not capable of making a will, since that is the very issue to be submitted to the jury. The justification for this rule is that to allow an opinion upon the ultimate issue in the case would be to usurp the function of the trier of fact.").
In this case, as one of the prosecutors stated during an in-chambers conference, "one of the crucial questions, and I don't think there will be a disagreement from the defense, is where Lucinda Robinson was standing when she was shot. That is a crucial question in this case." It was indeed a crucial question, and it was a question of fact for the jury. Witnesses could, and did, testify at trial as to the location and characteristics of certain blood splatters on the basement stairs. (See Part V below.) However, any testimony by these witnesses as to the position of Lucinda Robinson at the time she was shot would have been inadmissible under the above cited authorities. We note that the trial judge was extremely careful to prevent the introduction of such testimony by the witnesses at trial.
Clearly, the assertions made by Sergeant Reynolds in the taped statements with regard to Lucinda Robinson's position on the basement stairs were inadmissible. The fact that the assertions were made in the taped statement rather than on the witness stand does not render them any less inadmissible.Cf. State v. Britson, 130 Ariz. 380, 384,636 P.2d 628, 632 (1981) (offers by the defendant to take a polygraph test, which were "clearly inadmissible on their own, do not become admissible because included in [the defendant's] taped confession"); Pierce v. Commonwealth, 2 Va. App. 383,389, 345 S.E.2d 1, 4 (1986) (the general rule requiring the admission of a statement in its entirety does not cover those situations "in which part of the statement contains irrelevant and immaterial evidence, which is not admissible"). The introduction of this tape, which was played before the jury and which contained patently inadmissible assertions by Sergeant Reynolds, effectively permitted the State to bring in through the back door what it could not bring through the front. As the defendant argued at trial, the portions of the tape containing the inadmissible assertions of Sergeant Reynolds should have been deleted prior to the introduction of the tape. This is no different from excluding "parts of a confession which include admission of offenses separate from those relating to the crime in issue [and which] are not admissible." Malone v.State, 452 So.2d 1386, 1388 (Ala.Cr.App. 1984); Jordanv. State, 380 So.2d 999, 1002 (Ala.Cr.App. 1979), cert. denied, 380 So.2d 1003 (Ala. 1980).
 IV
Should the defendant be retried for the murder of both victims, the evidence presented at that trial may very well warrant a jury instruction on the lesser included offense of heat of passion manslaughter with regard to each victim. SeeWarren v. State, 34 Ala. App. 447, 449, 41 So.2d 201,202-03 (1949); Rigell v. State, 8 Ala. App. 46, 48-49,62 So. 977, 978 (1913). See also Biggs v. State,441 So.2d 989, 992 (Ala.Cr.App. 1983).
 V
The defendant asserts that the trial court erred in permitting the medical examiner and an investigator for the Coroner's Office to testify as to the location and characteristics of blood spatters found at the scene. He maintains that the two witnesses *Page 917 
were not properly qualified as experts to testify as to this matter.
Ronnie Williams, an investigator for the Jefferson County Coroner's Office, testified on direct examination that he had attended "a workshop on reconstruction of crime scenes using blood spatters and trace evidence." On voir dire, defense counsel established that Williams had testified regarding the interpretation of blood spatters approximately five times in the previous five years; that he had attended two workshops on the subject, one of which lasted approximately 40 hours; and that "this is a tremendous field of scientific literature."
After Williams testified, the jury was recessed for the night. At that time, the trial judge called a conference in his chambers, wherein he stated that he had "grave doubts about this man's testimony. I thought this man had taken some pictures." When it was established that Williams had been present at the scene of the shootings, where he had personally observed the spatters in question, and had, in fact, taken photographs of the spatters, but not the particular photographs from which he had testified, the trial judge stated, "Well, apparently it is — I consider this guy an expert. I do consider him an expert. And that's why I'm going to let him go ahead."
The next morning, Dr. Robert Brissie, the Chief Coroner and Medical Examiner of Jefferson County, testified on behalf of the State. In response to the prosecutor's question regarding his "training in the area of blood distribution or blood spattering or blood smearing," Dr. Brissie stated:
 "Well, I've been looking at blood spatters, drainage patterns, et cetera, I'd say for approximately 15 or 16 years. I've attended numerous meetings of the American Academy of Forensic Science and am on the Board of Directors of the National Association of Medical Examiners. I have had occasion to read materials on interpretation of blood spatters. I've had occasion to lecture on interpretation of blood spatters, not only in detective classes but also The American Society of Clinical Pathologists. And when I was in Charleston, South Carolina [where he was Deputy Chief Medical Examiner from 1970 to 1980] the people who went to the scene were the staff pathologists. And I attended many scenes in South Carolina. I took photographs of many scenes in South Carolina and interpreted many blood spatters while in South Carolina."
"The question of whether or not a particular witness will be allowed to testify as an expert is largely discretionary with the trial court, whose decision will not be disturbed on appeal except for palpable abuse." C. Gamble, McElroy's AlabamaEvidence § 127.01(5) (3d ed. 1977) (footnote omitted). We find no abuse in this case. These witnesses were clearly qualified to testify as to the blood spatterings and blood smears found at the scene of the shootings. Leonard v.State, 551 So.2d at 1146-47 (police corporal with similar training held qualified to testify "as to the angle and velocity of blood splatters on the ceiling in the residence where the crime [attempted murder by stabbing] occurred").See also State v. Rodgers, [Ms. 17785, July 25, 1990] (Idaho App. 1990).
The defendant also makes a one-sentence argument that the "State did not prove or establish that blood splatterings were generally recognized within the scientific community therefore the proper predicate was not made." Appellant's brief at 85. As the defendant cites Malone v. City of Silverhill,575 So.2d 101 (Ala.Cr.App. 1989), we take this to be an argument based on Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).
During Williams' testimony, the defendant objected to "the conclusions and interpretations of this witness on the basis of qualifications and the predicate." The defendant voiced a number of objections to Dr. Brissie's testimony on other grounds, but as to this matter, stated merely that he objected to "splatters interpretations and drops, and all this mess." Objections must be stated with "sufficient particularity" to apprise the trial court of "the basis for the objection" so as to permit the trial court to *Page 918 
make an informed decision "on the particular legal issue involved." Bland v. State, 395 So.2d 164, 168
(Ala.Cr.App. 1981). Accord, Lewis v. State,488 So.2d 1362, 1365 (Ala.Cr.App. 1986). We are far from convinced that the objection to Williams' testimony was sufficient to put the trial court on notice that the defendant was objecting to the State's failure to establish that "blood splatterings [are] generally recognized within the scientific community." It is clear that the objection to Brissie's testimony was not sufficient to do so.
In any event, some 10 pages in the record prior to the defendant's first objection quoted above, the prosecutor asked Williams, "Is this rough science as I will call it or training recognized universally in terms of the interpretations that can be gleaned from a blood spatter or blood smear?" Williams responded, "Yes, sir. I think it would be." While somewhat inartfully phrased, we find this sufficient to have required the defendant to state specific grounds for any claimed deficiency of the predicate. Cf. Cains v. State,555 So.2d 290, 298-99 (Ala.Cr.App. 1989) (" '[W]here a predicate is required for the admission of particular testimony and "where a predicate has in fact been laid," an objection that a proper or a sufficient predicate has not been laid is a "general objection merely, and will not be referred to any specific objection which could have been obviated if pointed out at the time." Southern Railway Company v. Dickson, 211 Ala. 481,487, 488, 100 So. 665, 671 (1924).' Suarez v.State, 369 So.2d 858, 862 (Ala.Cr.App.), cert. denied,Ex parte Suarez, 369 So.2d 863 (Ala. 1979)").
Inasmuch as this issue will no doubt again arise in the event of a retrial, we observe that one court has taken judicial notice of the "general acceptance" of blood spatter or blood stain pattern interpretation. Lewis v. State,737 S.W.2d 857, 860 (Tex.App. 1987). In Lewis, the Texas Court of Appeals stated:
 "[The criminologist's blood stain pattern] studies are based on general principles of physics, chemistry, biology, and mathematics, and his methods use tools as widely recognized as the microscope; his techniques are neither untested nor unreliable. We hold that [the criminologist's] testimony was properly admitted."
Id. at 861. Cf. State v. Proctor, 94 Or. App. 720,723, 767 P.2d 453, 455 (1989) (observing that "[o]nly the method by which [the blood spatter was] collected is novel; all other aspects of [the pathologist's] investigation are well known in the field of blood spatter analysis").
In contrast, the Iowa Supreme Court has held that theFrye "general scientific acceptance" test does not apply to blood spatter interpretation. State v. Hall,297 N.W.2d 80 (Iowa 1980), cert. denied, 450 U.S. 927,101 S.Ct. 1384, 67 L.Ed.2d 359 (1981). The court focused on the reliability of the proffered evidence, stating, "we do not believe that 'general scientific acceptance' is a prerequisite to admission of evidence, scientific or otherwise, if the reliability of the evidence is otherwise established."Id. at 85. The court concluded:
 "We fail to see any real distinction between this evidence and other areas of expert testimony readily received by courts, including ballistics, fingerprints, and blood types.
 "This evidence need not wait an assessment by the scientific community; the foundation evidence of reliability and the inherent understandability of the evidence itself provided sufficient bases for its admission." Id. at 86.
A number of other courts have held, without any discussion of the applicability of Frye, that testimony on blood spatter interpretation is admissible State v. Mix,781 P.2d 751, 757 (Mont. 1989); People v. Murray,147 A.D.2d 925, 537 N.Y.S.2d 399, appeal denied, 73 N.Y.2d 1019,541 N.Y.S.2d 773, 539 N.E.2d 601 (1989); State v.Myers, 391 S.E.2d 551, 554 (S.C. 1990); State v.Melson, 638 S.W.2d 342, 363-64 (Tenn. 1982), cert. denied,459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983). See also, Rob, A Trial Attorney's Primer on Blood SpatterAnalysis, Army Lawyer, August 1988, at 36. Clearly, whichever approach is taken, testimony concerning blood spatter interpretation is admissible. *Page 919 
It is the opinion of this Court that the defendant was denied a fair trial. For the reasons set forth in Part III above, the judgment of the circuit court is reversed and the cause remanded for further proceedings not inconsistent with this opinion.
REVERSED AND REMANDED.
All Judges concur.
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966).
[2] The notation "inaudible" appears throughout the transcript of the tape-recorded statement. The particular location of a number of those "inaudible" portions of the transcript and the recording present significant questions to this Court.