The appellant, Gregory Allen Brown, was indicted for murder, made capital because it was accomplished pursuant to a contract. See § 13A-5-40(a)(7), Code of Alabama 1975. The jury found the appellant guilty as charged in the indictment and recommended that he be sentenced to life imprisonment without parole. The trial court accepted the jury's recommendation and sentenced the appellant to life imprisonment without the possibility of parole.
The evidence presented by the State tends to establish the following. Jerry Wayne Callahan, the victim, was the owner of a wholesale diamond business and owned a 90% interest in Riverchase Jewelers, a jewelry store in Jefferson County, Alabama. The evidence tended to show that the businesses owned by Callahan were in serious financial trouble. The appellant owed approximately $1,100,000 on notes secured by the businesses, which he told witnesses he could not pay.
The appellant was a friend of Callahan's and became acquainted with him through gambling ventures. The appellant was the dealer in high stakes card games in which Callahan participated. Witnesses for the State testified that the appellant and Callahan had participated in a card game on the night of February 6, 1991, and that Callahan had won $15,000. The following day, February 7, 1991, the appellant paid Callahan $9,000 of the money that he had won at the card game.
Pat Costello, who owned the remaining 10% interest in Riverchase Jewelers, testified that Callahan had been upset over his financial situation and that he once commented that he would be better off dead. He testified that Callahan did not come into the store on February 7, 1991, the day of Callahan's death. He said that on that day the appellant had come to the store twice, once to pick up a large diamond ring, the appraised value of which was $15,600, and the next time to pick up paper-work regarding the ring. According to Costello, Callahan had instructed him to give the appellant these items and the appellant did not pay for the ring.
A neighbor who lived near Callahan testified that between 3:30 and 4:00 p.m., he heard a knock on his door. When he opened the door, he saw an individual, who he described as being the approximate height and weight of Robert Gospodareck, a codefendant in this case, walking down the stairs. Another neighbor testified that between 3:00 and 4:00 in the afternoon of February 7, 1991, she heard a loud "bang." On that same day, a woman who had occasionally dated Callahan discovered his body in his apartment. Callahan had been shot once through the heart.
Jerry Noto, the owner of a local convenience store, testified that the appellant had been in his store on two times on the day of Callahan's death. The first time the appellant came into the store, he was displaying the diamond ring. According to Noto, the appellant left the store and returned with Gospodareck. Witnesses testified that the appellant and Gospodareck were at the store between 4:30 and 5:00 on the afternoon of the killing. According to the witnesses, the appellant talked with Gospodareck for a short while and then Gospodareck left the store. Noto testified that the appellant appeared nervous. Testimony established that Callahan's apartment was near Noto's store.
During their investigation of Callahan's death, investigators with the Hoover Police Department, Detective Peyton Zarzour and Sergeant Edward Braden, received information that the appellant was involved in the card game that took place the night before Callahan's death. The investigators contacted the appellant by telephone to arrange a meeting with him at the Hoover Police Department to discuss their investigation. The appellant agreed to meet with the investigators. As the time of the meeting approached, the investigators were watching the appellant's home. The investigators saw the appellant load his vehicle with luggage and boxes. The appellant then got into his vehicle and drove toward Fultondale, Alabama, in the opposite direction of the Hoover *Page 483 
Police Department. The investigators suspected that the appellant was attempting to leave town without meeting with them and they asked Gardendale police officers stop the appellant's vehicle. Once they stopped the vehicle, the Gardendale police called the investigators to the scene. The appellant assured them that he still planned to meet with them as he had told them earlier he would.
Zarzour, without entering the vehicle, saw a .45 caliber handgun inside the appellant's vehicle. The appellant told the investigator that Callahan had given him the gun. The appellant then told the investigators that he had a letter that would explain everything. The appellant permitted the investigators to enter his car and get the letter. The letter was handwritten and stated:
 "I, Jerry W. Callahan, being of sound mind and body, do state that it is my wish that if certain parties are arrested for causing my death I do not wish for their prosecution. This party has enabled me to leave this life with some form of dignity and self respect. My deteriorating condition and the nonexisting chance of any survival have lead me to call on my friend for the ultimate act of friendship. Dr. Charles Clark of St. Vincent and Dr. Zeiger of Carraway can and will attest to my poor chance of any kind of decent existence in my last weeks. I did not want my family to live with the stigma that I took my own life coupled with the fact they didn't know of my condition. Please know that this act was done in the manner that I chose, which would cause myself and the above mentioned party the least amount of suffering."
The note was signed by Callahan. At trial, a handwriting analyst testified that in his opinion the note was written by Callahan.
The appellant was then read his Miranda rights, was placed under arrest, and was taken to the Hoover police station. The appellant was again read his Miranda rights before any statements were taken. The appellant indicated that he understood his rights, and he signed a waiver of rights form and a consent to search form. The appellant's statement was videotaped. After the appellant made his videotaped statement, he made a written statement. In his statements, the appellant explained his participation in the offense and implicated Gospodareck in the shooting of Callahan.
A forensics expert testified that an autopsy on Callahan did not reveal any life threatening illness that would, in the near future, cause Callahan's death. Also, the testimony reflected that the doctors named in Callahan's note had not treated Callahan for any life threatening illness.
 I
The appellant argues that the trial court erred in failing to suppress the statements he made to the detectives. Specifically, the appellant argues that the statements were obtained in violation of Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Edwards v. Arizona,451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), because, he says, during the course of giving his videotaped statement, the appellant requested that he be allowed to speak to an attorney and the officers did not provide him with counsel nor did they clarify his request for counsel before continuing with their interrogation.
The transcript of the videotaped statement of the appellant shows that the following conversation took place:
"Q (By Sgt. Braden) From the very start.
 "Q (By Det. Zarzour) From the very start. From the time he gave you the letter —
"A [appellant] Okay.
"Q Go ahead.
 "A Is it going to piss y'all off if I ask for my — to talk to a friend that is an attorney. I mean, I'm going to do whatever I have got to do. Don't get me wrong.
 "Q Well, I understand that. I understand what you are saying.
 "A You have got to realize, man, I'm . . . scared to death.
 "Q Well, and rightfully so. I don't blame you one bit because there's a serious problem here, but if you didn't pull the trigger, then we need to know what exactly happened, okay? *Page 484 
 "Q (By Sgt. Braden) It's up to you, Greg, whatever you want to do. Like he said.
 "A Listen, I don't know what exactly happened. I was not there.
"Q Okay.
 "Q We know you met — we know you met him over at Pick-a-Pack, we know y'all left, we know you brought him back. We know all that. We know where you were, we have got people that have seen you, we know. It's like I told you earlier, we already know.
 "Q (By Det. Zarzour) That's why I said don't beat around the bush, let's get to it and get it over with.
"A All right. . . ."
Before this colloquy, the appellant had made no incriminating statements. After this colloquy, the appellant gave the investigators information regarding the death of Callahan. After the appellant gave the videotaped statement, the appellant then made a summarized written statement. We agree with the appellant that both statements were due to be suppressed.
In Miranda, the United States Supreme Court held that under the Fifth Amendment, an accused has the right to counsel during custodial interrogation. In Edwards, our Supreme Court expounded on the accused's Fifth Amendment rights and held:
 "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communications, exchanges or conversations with the police."
451 U.S. at 484, 101 S.Ct. at 1884-85 (footnote omitted).
In this case, the appellant's request to speak to a friend who is also an attorney was clearly an invocation of his right to counsel. Further interrogation by the investigators without providing the appellant the opportunity to confer with an attorney violated the appellant's Fifth Amendment rights as discussed in Miranda and Edwards.
The State argues in its brief that, "At most, the comments made by Appellant could be considered an equivocal invocation of his right to counsel." However, even if we assumed that the appellant's request to speak to an attorney was equivocal or ambiguous, the failure of the investigators to clarify his request to speak to his attorney still violatesMiranda. In Robinson v. State, 574 So.2d 910, 914
(Ala.Crim.App. 1990), we adhered to the holdings of the Fifth Circuit and Eleventh Circuit Courts of Appeals:
 " 'When a defendant makes an equivocal request for an attorney during a custodial interrogation, "the scope of that interrogation is immediately narrowed to one subject and one only. Further questioning thereafter must be limited to clarifying that request until it is clarified." Thompson v. Wainwright, 601 F.2d 768, 771 (5th Cir. 1979) (emphasis in original); Nash v. Estelle, 597 F.2d 513, 517 (5th Cir.) (en banc), cert. denied, 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409
(1979). Any statement taken by the state after the equivocal request for counsel is made, but before it is clarified as an effective waiver of counsel, violates Miranda.' Owen v. Alabama, 849 F.2d 536, 539 (11th Cir. 1988)."
Contrary to the State's argument, we hold that at the very least the appellant's comment was an equivocal request to speak to counsel. Additionally, we conclude that the investigators did not clarify the appellant's request to confer with counsel. Rather, the investigators continued their interrogation as if the request to speak with counsel had not been made, telling the appellant how serious the matter was, prodding him to provide more information, and ignoring the requirement that their inquiries after the appellant's request was made be specifically limited to clarifying that request. Thus, regardless whether the appellant's request to speak to his friend who is an attorney is considered a clear request or is considered an equivocal request, the investigators' failure to respond *Page 485 
to or to clarify that request nonetheless violated the appellant's Fifth Amendment rights.
Because the appellant's statements were obtained in violation of his Fifth Amendment rights, the statements obtained after his invocation of his right to confer with counsel were due to be suppressed.
 II
The appellant further argues that his statements were due to be suppressed because they were not voluntarily made and were obtained by unlawful inducements. Because we are holding that the appellant's statements were due to be suppressed for the reasons set forth in part I of this opinion, we need not address this argument.
The judgment of the trial court is due to be, and it is hereby, reversed and this case is hereby remanded for a new trial.
REVERSED AND REMANDED.
All Judges concur.