[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 896 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 897 
The appellant, Joseph Ward Gentry, was indicted on April 7, 1989, in Jefferson County, for the capital offense of murder committed during a burglary in the first or second degree or an attempt thereof, a violation of Ala. Code 1975, §13A-5-40(a)(4). The indictment reads, in pertinent part, as follows:
 "The grand jury charges that . . . Joseph Ward Gentry, did intentionally cause the death of Kimberly Diane Hill by stabbing her with a knife, and Joseph Ward Gentry caused said death during the time that Joseph Ward Gentry knowingly and unlawfully entered or remained, or attempted to enter or remain unlawfully in the dwelling of Kimberly Diane Hill with intent to commit murder, and the said Joseph Ward Gentry did cause physical injury to Kimberly Diane Hill by the said stabbing with a knife and by beating with a blunt object, in violation of Section 13A-5-40(a)(4) of the Alabama Criminal Code."
At the arraignment, the appellant pleaded not guilty. On August 5, 1992, a jury found him guilty of the capital offense charged in the indictment. A sentencing hearing was held before the jury, in accordance with §§ 13A-5-45 and -46, and the jury recommended that the sentence be life imprisonment without the possibility of parole, by a vote of seven to five.[1] Thereafter, the trial court held another sentencing hearing in accordance with §§ 13A-5-47 through -52, and, after weighing the aggravating and mitigating circumstances and considering the jury's recommendation, sentenced the appellant to death. The trial court's sentencing order, setting out written findings as to aggravating and mitigating circumstances and setting out written findings of fact summarizing the crime and the appellant's participation in it, is attached hereto as an appendix and is made a part of the opinion. "While the jury's recommendation concerning sentence shall be given consideration, it is not binding *Page 898 
upon the court." § 13A-5-47(e). The appellant raises eight issues on appeal.[2]
The state's evidence shows the following: The victim, Kimberly Diane Hill, and the appellant, who were involved in an affair, worked together at the Bank Operations Center of AmSouth Bank of Birmingham; the appellant was the shift manager and the victim's supervisor. On January 12, 1989, the day preceding the murder, they were to work the evening shift from 4:00 p.m. to 1:00 a.m. The appellant was married and had two children; Hill was a 24-year-old divorcee with no children. She had given the appellant keys to her apartment, and he was a frequent visitor there. Hill became pregnant as a result of the relationship, and the appellant promised to divorce his wife and to marry her. On the day of the murder, the appellant complained of being ill, left work early, and went to Hill's apartment, where he removed his work clothes and put on a pair of "camouflage fatigues." He waited in the dark for Hill to come home. When she entered the apartment, he grabbed her, beat her, and stabbed her repeatedly with a knife he had obtained from the kitchen. Then, when he observed that she was still moving, he bound her hands and feet with telephone cords and stuffed a towel down her throat. Before the appellant left the apartment, he opened the patio door, dumped the contents of Hill's purse on the floor, removed two rings from her fingers, and took other items from her jewelry box in an effort to make the crime appear as a "robbery attempt." After leaving the apartment, the appellant discarded the "camouflage fatigues" and jewelry in various parts of the city by throwing them from his automobile, and he returned to his home. The appellant went to work later in the day on January 13, 1989, at the regular time and, when Hill did not arrive at work, he expressed concern regarding her whereabouts, asked several people to call and check on her, and eventually asked Hill's mother to go to the victim's apartment to check on her. Hill's mother went to her apartment, where she discovered her daughter's body.
The autopsy revealed that the victim sustained 10 stab wounds, two incised wounds, and nine lacerations. The blade of the knife, which was left imbedded in her body, was 6 1/2" long. Her face was bruised, and her nose was broken. She died from multiple stab wounds and multiple blunt traumas. The autopsy also revealed that she was seven weeks pregnant.
Much of the state's evidence consisted of facts first disclosed by the appellant's confession and later corroborated. The appellant gave a statement to police investigators on the day after the murder, admitting that he had killed the victim. This statement was tape-recorded and introduced into evidence by the state. He stated, among other things, that he left work early the day before, that he went to Hill's apartment, that he changed into "camouflage fatigues," that he left his keys to her apartment on the kitchen counter, and that he waited in the dark for her to come home so he could "play a little game and jump out and surprise her." He further stated that when Hill came home, he startled her when he jumped out to surprise her and she struck him in the chest; that he lost his temper and threw a punch at her; and that they began punching each other. He stated that they "wrestled" up and down the hall and into the living room; that, when she was lying face down on the hall floor, he grabbed a knife from the kitchen and began "jabbing" her in the back; and that, because she was "moving," he took the telephone cords from the dining room and bedroom telephones and tied her hands and feet so that she could not move. He further stated that when he realized what he had done, he panicked and started trying to "figure out a way to cover it up"; that he knew that if he left her the way she was, as strong as she was and as strong-willed as she was, there was a possibility that she could get help and tell somebody; and *Page 899 
that, in order to make the crime look like a "robbery attempt," he opened the sliding glass door and screen, dumped the contents of her purse onto the floor and took the rings from her fingers and the jewelry from her jewelry box. Finally, he stated that he discarded her property and the camouflage clothing as he drove around town.
The state also presented evidence of the appellant's admission, to a friend, who was also a shift manager at the Bank Operations Center, later on the day of the killing that he had stabbed Hill and that he thought she was alive when he left the apartment.
The appellant testified at the hearing on the motion to suppress his inculpatory statement. He did not testify at either the guilt phase or the sentencing phase of the trial and offered evidence only at the sentencing phase. The appellant did not deny killing Hill, but defense counsel urged the jury, in opening and closing statements in the guilt phase of the trial, to find that the killing arose out of a "domestic dispute"; that the appellant killed Hill in the "heat of passion"; and that he should be found guilty of manslaughter.
 I. A.
The appellant contends that the trial court committed reversible error in denying his motion to suppress his incriminating statement. He asserts that this statement was obtained in violation of Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Edwards v. Arizona,451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), because, he says, although he invoked his right to counsel, albeit equivocally, before giving the statement to the investigators, counsel was not provided and the investigators did not attempt to clarify his equivocal request for counsel before continuing with their interrogation and the taking of his statement.
Around 11:15 p.m. on the day following Hill's death, Investigator Roger Harrison visited the appellant at his place of employment and asked him if he had heard of Hill's death. The appellant stated that he had. Harrison asked the appellant if he would go to city hall to talk with the investigators, and he agreed. The appellant followed the investigators to the city hall in his automobile. He was questioned by Harrison in a conference room. Investigator Forrest Duncan was also present. Harrison asked the appellant about his relationship with Hill, when he last saw or talked with her, whether he had keys to her apartment, how long she had been pregnant, who else knew about their relationship, and if he knew of anyone who would want to cause her harm. According to Harrison, based upon things he had already learned in his investigation, he knew that some of the appellant's answers, particularly his answer to the question concerning keys to the victim's apartment, were untrue, and he noticed that the appellant's hands and knuckles were bruised.
Because of the evasiveness and untruthfulness of the appellant's answers and because of the bruises on the appellant's hands, Harrison began to consider the appellant as a suspect. He stopped asking questions and advised the appellant of his constitutional rights as required byMiranda. In advising the appellant of his rights, Harrison read the rights from a police department form. He advised him that, among other rights, he had the right to talk to a lawyer and have the lawyer present while he was being questioned, that if he could not afford a lawyer, one would be appointed to represent him before he was questioned, and that if he wanted to answer questions without a lawyer present, he had the right to stop the questioning at any time. Harrison also informed the appellant that it was not necessary that he answer any questions before having a bond set by the court. Before he was advised of his Miranda rights, the appellant made no statement admitting any involvement in the crime; rather he denied any involvement.
After he had read the appellant his rights, Harrison asked the appellant if he understood them, and the appellant stated that he did. He asked the appellant if he wanted to talk with the investigators, and he said that he did. Harrison gave the appellant the rights form, which contained a waiver, and *Page 900 
asked him to read it and sign it, which he did. The waiver states in part: "I have read the above and understand fully each of these rights. Having these rights in mind I wish to make a voluntary statement and answer any questions without contacting an attorney or having one present." Harrison testified that upon signing the waiver, the appellant stated that he understood his rights and that he wanted to talk with them without a lawyer's being present. The appellant was not threatened or coerced in any manner to make a statement and no promises or offers were made to him. He did not appear tired even though the hour was late. (The appellant had gone to city hall around midnight and signed the waiver at 2:18 a.m.) Harrison stated that the appellant's lack of tiredness was probably due to the fact that the appellant's normal working hours were until 1:00 a.m.
After the appellant waived his rights and agreed to answer questions, Harrison reviewed the statements that the appellant had previously made that Harrison thought were inconsistent or untrue. The appellant denied killing the victim, and Harrison told him that he believed that he did. The appellant asked Harrison, "If I tell you what happened, will it make a difference?" Harrison stated that he could not promise him anything and that all he could do would be to present the facts. The appellant then asked, "Is it too late for a lawyer?" Harrison replied, "It is never too late for a lawyer." After two or three minutes of silence, during which the appellant said he was thinking, Harrison asked him if he wanted to tell them what happened, and, according to Harrison, he said, "O.K., I'll tell you."
The record, in pertinent part, shows the following:
 "Q. [Defense counsel]: And then you made a note here, 'Is it too late for a lawyer?' He asked, 'Is it too late for a lawyer?'
"A. [Harrison]: That is correct.
 "Q. And you said, 'It's never too late for a lawyer'?
"A. That is correct.
 "Q. Now, you can refer to your notes if you want, but is there anything before that point in the conversation that indicates that he was involved in this at all?
"A. I don't —
 "Q. I mean he basically told you that she was pregnant, they had a relationship, but did he ever indicate to you before he asked for the lawyer that he killed her?
"A. No, sir.
 "Q. Okay. And you said, 'It's never too late for a lawyer'?
"A. That is correct.
 "Q. And then you asked him if he wanted to tell you what happened?
"A. That is correct.
 "Q. You didn't question him any further on the subject of a lawyer?
"A. No, sir, I did not.
 "Q. You didn't stop the questioning and tell him you can call a lawyer if you want one?
 "A. I was answering his question. He asked me if it was too late for a lawyer and I answered his question, 'It's never too late for a lawyer.'
 "Q. Okay. So what was your understanding of that statement, Roger? I mean what did you think? Did you just think that that was a passing statement? You knew that you were involved in the investigation of a homicide and that he was probably going to be a suspect. And he asked you if it was too late for a lawyer. What did you think that he meant by that?
 "A. At this time, Mr. Gentry had already been advised of his constitutional rights and he had already been told that he had the right to a lawyer and had a right to have a lawyer present while he was being questioned.
 "At the time he asked me this particular question, I answered his question as truthfully as I possibly could that it was never too late for a lawyer. At that point, I also paused and waited and we just sat in a blank room for some two or three minutes to find out what his wishes were. At that point when he never said anything else about an attorney, I assumed he was not asking for an attorney and I went further. *Page 901 
 "Q. So you said you stopped for a couple of minutes and didn't ask him any questions during that period of time?
"A. Yes, sir.
"Q. In order for him to follow up his request?
"A. That is correct.
"Q. And he didn't do it?
"A. That is correct."
 "Q. [On cross-examination by the prosecutor]: When you got to the point of his asking' 'Is it too late for a lawyer?' did you — Other than the response that you made which I believe you have quoted as 'It's never too late for a lawyer,' did you or anyone else say anything to him in response to that question other than what you told us?
"A. Not other than what I've said.
 "Q. And you said there was a pause of some two or three minutes and then the next thing that was said was what you had quoted in your notes as 'Do you want to tell me what happened?'
"A. That is correct.
"Q. And he said, 'Okay, I'll tell you'?
"A. That is correct.
 "Q. Did he then proceed to tell you a different story from what he had been telling you?
"A. Yes, sir."
The appellant, in answer to Harrison's questions, revealed his involvement in the crime. Harrison made notes of the interview. The notes were introduced into evidence at the suppression hearing. The appellant also agreed to give a taped statement. Harrison again advised the appellant of hisMiranda rights, and the appellant gave his statement. The tape was introduced into evidence and played for the jury.
The appellant testified on direct examination at the suppression hearing that when he asked if it was too late for a lawyer, he wanted a lawyer. The record shows the following:
 "Q. [Defense counsel]: When you made that statement about a lawyer, did you want a lawyer?
"A. [Defendant]: Yes.
 "Q. And they didn't question you any further about it? All they did was tell you it's never too late for a lawyer?
"A. Yes, sir."
The Fifth Amendment requires that when a person requests an attorney during a custodial interrogation, all questioning must cease until an attorney is present.[3] Edwards, 451 U.S. at 484,101 S.Ct. at 1884-85; Miranda, 384 U.S. at 474,86 S.Ct. at 1627-28. When a defendant makes an equivocal request for an attorney during a custodial interrogation, the scope of that interrogation is immediately narrowed to one subject — the clarification of the request — and any statement taken after the equivocal request for counsel is made, but before it is clarified as an effective waiver of counsel, violates Miranda.Owen v. Alabama, 849 F.2d 536 (11th Cir. 1988); Thompson v.Wainwright, 601 F.2d 768 (5th Cir. 1979); Holliday v. State,641 So.2d 325 (Ala.Cr.App. 1994); Brown v. State, 630 So.2d 481
(Ala.Cr.App.), cert. denied, 630 So.2d 481 (Ala. 1993); Robinsonv. State, 574 So.2d 910 (Ala.Cr.App. 1990), cert. denied,574 So.2d 910 (Ala. 1991).[4]
We are concerned here with whether the language used by the appellant amounted to a request — either clear or equivocal — for *Page 902 
counsel. The totality of the circumstances test, which is used to determine whether an accused has knowingly and voluntarily waived his Miranda rights, has no role in the determination of whether an accused's request for counsel is clear or equivocal.North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755,60 L.Ed.2d 286 (1979); Owen v. Alabama. The appellant argues that his question to Harrison "Is it too late for a lawyer?" was an equivocal request for counsel requiring clarification, and that Harrison's failure to clarify the request and see that counsel was provided rendered the appellant's subsequent statement inadmissible. The state argues that the appellant's question, "is, at best, an ambiguous and equivocal request for an attorney" and that the clarification requirement was satisfied by Harrison's answer that "It's never too late for a lawyer" coupled with the two- to three-minute delay in the questioning to allow the appellant to consider whether he wanted counsel and with Harrison's question to the appellant as to whether he wanted to go ahead and tell what happened. It argues that it is reasonable to infer that the appellant, having been advised that it was never too late for a lawyer, thought the matter over during the interval and decided to proceed without counsel.
After careful review of the record, we conclude that the question "Is it too late for a lawyer?" was not a request for counsel, and that, under the circumstances, Harrison properly determined that the appellant was not indicating a desire to talk with counsel or invoking his right to counsel. Under the circumstances here, we conclude that the question did not qualify as an equivocal request for counsel; thus Harrison was not required to stop the interrogation to clarify the appellant's question. It was a simple question, the answer to which was forthright, not misleading, and which would have logically caused the appellant to seriously ponder the matter of whether he should ask for counsel. After two or three minutes' deliberation, he elected to proceed with the interrogation without counsel. The record reflects that the appellant was not tired at the time and that his will was not overborne by the investigators, that he appeared to have control of his faculties, that he was a shift manager of a banking operation, and a person of experience, intelligence, and education, who obviously knew what he was doing. It should be noted that the question was asked after the appellant had been advised of his Miranda rights, including the right to counsel, and after he had waived those rights and stated that he was willing to talk to the officers without counsel's being present. In addition, the appellant was advised of his Miranda
rights again just before he gave his taped statement. It is significant that the appellant was presented with three opportunities to request counsel before giving his taped statement, and did not do so. The trial court correctly denied the motion to suppress because there was no request for counsel.
However, even assuming that the appellant's question could be construed as an equivocal request for counsel, Harrison's actions satisfied the clarification requirement.
 B.
Although the appellant in his brief does not specifically address the issue of the voluntariness of the waiver of hisMiranda rights, he does allege generally that the trial court erred in denying his motion to suppress his statement because he "did not make a voluntary, knowing, and intelligent waiver of his constitutional rights under the Fifth and Sixth Amendments." Because the issue of voluntariness is raised, albeit generally, and because this is a case involving the death penalty, requiring that we review the record for plain error, we have reviewed the record to determine whether the appellant voluntarily and knowingly waived his Miranda rights before making the inculpatory statement to the investigators and whether the statement was voluntary.
Extrajudicial confessions are prima facie involuntary and inadmissible as evidence; the burden is on the state to show voluntariness and a Miranda predicate in order for such confessions to be admitted into evidence. Lewis v. State,535 So.2d 228 (Ala. 1988). In order for a confession to be admitted into evidence it cannot be the result *Page 903 
of any direct or implied promise, however slight. Goodson v.State, 540 So.2d 789 (Ala.Cr.App.), cert. denied, 540 So.2d 789
(Ala. 1989). Whether there was a voluntary and knowing waiver ofMiranda rights must be decided from the particular facts and circumstances of each case, including the background, experience, and conduct of the accused — the totality of the circumstances. Lewis v. State; Magwood v. State, 494 So.2d 124
(Ala.Cr.App.), aff'd, 494 So.2d 154 (Ala.), cert. denied,479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986).
 " 'The true test of voluntariness of extra-judicial confessions is whether, under all surrounding circumstances, they have been induced by a threat or a promise, express or implied, operating to produce in the mind of the prisoner apprehension of harm or hope of favor; such confessions must be excluded from the consideration of the jury as having been procured by undue influence.' "
Ex parte Weeks, 531 So.2d 643, 644 (Ala. 1988), quoting Womackv. State, 281 Ala. 499, 205 So.2d 579 (1967). The question of whether a confession is voluntary is initially to be determined by the trial court, and thereafter the voluntariness as affecting the credibility and weight to be given any statement that an accused has made is a determination for the jury. Lewisv. State; Ex parte Singleton, 465 So.2d 443 (Ala. 1985). The trial court need only be convinced from a preponderance of the evidence to find a confession to have been voluntarily made. Exparte McCary, 528 So.2d 1133 (Ala. 1988); Ex parte Singleton.
The appellant testified that he was promised that he could see his wife and children before he was taken to jailif he made a statement. Harrison testified that his agreement to let the appellant see his wife and children before he was taken to jail was made after the appellant had consented to tell them what happened and before he gave of the statement. The record shows the following:
 "Q. [Defense counsel]: At what point — You said nobody promised him anything. At what point did y'all have a conversation about going back to his wife to see his wife and children before you took him to jail? Do you remember that?
 "A. [Harrison]: This was after — This was before we turned on the tape and right after we had discussed that he was going to tell us what had happened.
 "Q. Okay. So you basically said we will take you over to see — He asked you if he could go see his wife?
 "A. Yeah, he asked me — His exact words, I think, were something to the effect of 'Would you take me to see my wife before I go to jail?' and I said, 'Certainly.'
 "Q. And this is before he made the statement, the taped incriminating statement?
"A. Yeah."
The appellant testified as follows:
 "Q. [Defense counsel]: You also heard me ask him some questions about you going to see your wife. Tell us about that. What happened?
 "A. [Defendant]: When they started asking concerning wanting a statement from me, I started — You know, I didn't know how to react. I was upset that they were already considering putting me in jail, that they had already decided that I was going to be locked — put away and taken to jail that night and my concern was — You know, I was already aggravated at what had happened. I was upset with what had happened. I didn't know how to react to it. I became upset at the fact that I was going to be away from my daughter on her birthday. I mentioned that to them. I asked if there was any way I could go and see my wife and children.
"Q. What did they say about that?
 "A. They told me that if I gave a statement, that yes, they would allow me — they would take me back to see my wife and children before they took me to jail.
 "Q. After you gave a statement on tape, did they in fact take you back over to see your wife and children before they took you to jail?
"A. Yes, sir."
The testimony of Harrison and the appellant is conflicting as to whether the statement was obtained as a result of a promise. In *Page 904 
determining the voluntariness and hence the admissibility of a confession, the trial court may properly consider the credibility of the defendant as well as that of any witness who testified at the suppression hearing. Player v. State,421 So.2d 1338 (Ala.Cr.App.), cert. denied, 421 So.2d 1338
(Ala. 1982). "When there is conflicting evidence of the circumstances surrounding an incriminating statement or a confession, it is the duty of the trial judge to determine its admissibility, and if the trial judge decides it is admissible his decision will not be disturbed on appeal 'unless found to be manifestly contrary to the great weight of the evidence.' "Ex parte Matthews, 601 So.2d 52, 53 (Ala. 1992), quotingWilliams v. State, 456 So.2d 852, 855 (Ala.Cr.App. 1984). See also Lewis v. State, 535 So.2d at 235. In such cases, the findings of the trial court must be accorded great weight.Thomas v. State, 625 So.2d 1174 (Ala.Cr.App. 1993).
In this case, the trial court did not give any reason for denying the appellant's motion to suppress; however, the trial court's denial of the motion to suppress is supported by substantial evidence. Harrison testified that he consented to let the appellant see his wife and children before he was taken to jail after the appellant had waived his Miranda rights and had agreed to tell the investigators what had happened. The logical conclusion to be drawn from Harrison's testimony is that his agreeing to let the appellant see his family before going to jail was not a motivating factor in the appellant's decision to make a statement because, when Harrison and the appellant had the conversation about visitation, the appellant had already agreed to tell what had happened. Harrison's testimony is bolstered by his notes, which were made contemporaneously with his discussion with the appellant about making a statement. The notes clearly show that when the appellant asked to see his wife and children he had already agreed to tell what happened. Moreover, the appellant's request itself supports Harrison's testimony because it indicates that the appellant intended to make a statement that he knew would lead to his arrest and incarceration. Harrison's notes show the following:
"[Harrison]: Do you want to tell what happened?
"[Defendant]: O.K., I'll tell you.
 "Can you take me to see my wife and children before I go to jail[?]
"[Harrison]: Yes.
"What happened?"
We consider that the record shows that the state met its burden in proving that the appellant's statement was made voluntarily after a voluntary and knowing waiver ofMiranda rights. The weight and preponderance of the evidence support the decision of the trial court in denying the motion to suppress.
 II.
The appellant contends that the state failed to prove the element of burglary, an essential element of the capital offense charged, and that, therefore, the trial court erred in denying his motion for a judgment of acquittal made at the conclusion of the state's case-in-chief on the ground that the state failed to prove a prima facie case.
The indictment charges, inter alia, that the appellant "knowingly and unlawfully entered or remained . . . unlawfully in the dwelling of Kimberly Diane Hill with the intent to commit murder" and that the appellant "did cause physical injury to" the victim by stabbing her with a knife and beating her with a blunt instrument. These allegations charge the offense of burglary in the first degree, § 13A-7-5. Section13A-7-5 provides: "A person commits the crime of burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully in a dwelling with the intent to commit a crime therein, and, if, in effectuating entry or while in the dwelling . . . he . . . (1) Is armed with a deadly weapon; or (2) Causes physical injury to any person who is not a participant in the crime." The appellant argues that he could not have committed a burglary because he had a right, privilege, or license extended to him by the victim to enter her dwelling at any time and to remain in the dwelling. The evidence shows that he did have the victim's permission to enter her dwelling at any time *Page 905 
and that he had keys to her dwelling, which she had given him.
The issue presented here, whether the state proved that the appellant committed a burglary, is dependent on the interpretation of the phrase "unlawfully enters or remains unlawfully in a dwelling" in the burglary statute. "A person 'enters or remains unlawfully' in or upon premises when he is not licensed, invited or privileged to do so." § 13A-7-1(4). The appellant argues that where the initial entry was with consent, the fact that a crime was committed in the dwelling or that the person who entered lawfully intended to commit a crime once inside is an insufficient basis for finding that the entry or remaining was without license or privilege and hence "unlawful." He argues that there must be something more to establish termination of license than the commission of a criminal act or an order to leave after criminal intent is manifested. In support of his argument, he relies on the interpretation placed on a similar burglary statute in the state of New York, and citing People v. Hutchinson, 124 Misc.2d 487,477 N.Y.S.2d 965 (Sup. 1984); People v. Gaines, 74 N.Y.2d 358, 547 N.Y.S.2d 620, 546 N.E.2d 913 (1989); and People v.Konikov, 160 A.D.2d 146, 559 N.Y.S.2d 901 (1990). He concedes that we have interpreted the statute differently. Thus he is apparently asking us to overrule our prior cases.
This precise issue was raised by the appellant in the first trial and in his first appeal of this case to this court, and we ruled against him, Gentry v. State, 595 So.2d 548
(Ala.Cr.App. 1991), cert. denied, 595 So.2d 548 (Ala. 1992), relying on Moss v. State, 536 So.2d 129 (Ala.Cr.App. 1988), andMinshew v. State, 542 So.2d 307 (Ala.Cr.App. 1988). We held inGentry that even if the entry was consensual, a burglary charge could be supported by a nonconsensual remaining and the fact that the victim terminated the appellant's license or privilege to remain on the premises can be inferred where, as here, a struggle took place and the victim was beaten. We further held that the trial court properly submitted to the jury the issue of whether the appellant entered or remained unlawfully in the victim's apartment. The evidence presented at both trials is substantially the same. No new evidence was presented in the second trial of the case that would cause us to change our earlier opinion on this issue. The authorities cited by the appellant on this second appeal in support of his contention are no more persuasive than those cited on his first appeal. We reaffirm and adopt our prior holding on this issue. The trial court's denial of the motion for a judgment of acquittal on this ground was proper. The trial court properly submitted the issue to the jury.
 III.
The appellant next contends that the prosecutor's comments during his closing arguments in the guilt phase of the trial were improper, because, he says, he expressed his personal opinion, made disparaging "characterizations" of the appellant, injected facts not in evidence, and urged the jury to have sympathy for the victim. Questions of the propriety of argument of counsel are largely within the trial court's discretion,McCullough v. State, 357 So.2d 397 (Ala.Cr.App. 1978), and we will not reverse the trial court on that issue unless there has been an abuse of that discretion, Miller v. State,431 So.2d 586 (Ala.Cr.App. 1983). The prosecution, as well as defense counsel, has the right to present its impressions from the evidence, and may argue every matter of legitimate inference that can be reasonably drawn from the evidence. Sanders v.State, 423 So.2d 348 (Ala.Cr.App. 1982). In reviewing allegedly improper prosecutorial argument, we must first determine if the argument was, in fact, improper. In doing so, the prosecutor's comments must be evaluated in the context of the entire trial.Duren v. State, 590 So.2d 360 (Ala.Cr.App. 1990). If the argument is determined to be improper, the test, for review, is not whether the comments did influence the jury, but whether the comments could have influenced the jury in arriving at its verdict. Ex parte Ward, 497 So.2d 575 (Ala. 1986); Rutledge v.State, 523 So.2d 1087 (Ala.Cr.App. 1987), rev'd and remanded on other grounds, 523 So.2d 1118 (Ala. 1988). In judging a prosecutor's closing argument, the standard is whether the argument so infected the trial with unfairness as to make the *Page 906 
resulting conviction a denial of due process. Darden v.Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144
(1986).
The appellant contends that the following comments by the prosecutor in closing argument constituted an improper appeal to the jury to have sympathy for the victim: "[n]obody went out and empaneled a jury for Kim Hill"; "[y]ou can look at Ward Gentry, but you cannot look at Kim Hill"; "nobody went out and got a judge for Kim"; "nobody went out and got two lawyers for Kim"; and "[h]e was her judge, and her jury, and her executioner." He argues that these comments "impermissibly influenced the jury to disregard [its] legal duties and render a guilty verdict because of [its] sympathy for the deceased." We do not agree. We view the comments as a call for justice, not sympathy, and, thus conclude that they are within the latitude allowed prosecutors in their exhortation to the jury to discharge its duties. Ex parte Waldrop, 459 So.2d 959
(Ala. 1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050,85 L.Ed.2d 323 (1985); Rutledge v. State. The comment that Gentry was "her judge, and her jury, and her executioner" was the prosecutor's impression and opinion derived from the evidence in the case, which he could legitimately argue. Henderson v.State, 584 So.2d 841 (Ala.Cr.App. 1988); Galloway v. State,484 So.2d 1199 (Ala.Cr.App. 1986). We also view the comments as a way of rebutting the defense argument based on possible sympathy for the appellant's family. Rutledge v. State.
The appellant contends that the prosecutor's comments referring to defense counsel's "audacity" and to defense counsel's wanting to confuse the jury were improper. We do not agree. We view the comments as legitimate responses to defense counsel's argument.
The appellant next contends that the prosecutor improperly argued facts not in evidence. While counsel should be given considerable latitude in drawing reasonable inferences from the evidence, counsel may not argue as a fact that which is not supported by the evidence. Ex parte Washington, 507 So.2d 1360
(Ala. 1986). The appellant argues that the prosecutor's comment that the appellant enjoyed committing the murder was unsupported by the evidence, was highly prejudicial, and requires a reversal. The comment must be viewed in the context of the entire argument. The record shows the following:
 "MR. BROWN [prosecutor]: — to stand up here and tell you that he loved her. He loved her so much. He loved her so much that this is the memory of love that she got to take with her to eternity. That's how much he loved her. That's how much he loved Ward Gentry. And I suggest to you he enjoyed it.
 "MR. DEL GROSSO [defense counsel]: Object to that and move for a mistrial.
"THE COURT: Overruled.
 "MR. BROWN: He created this monument of his lasting love. And what was the last thing he did? He called her mother and sent her over there to look at this because he was so proud of it. If anybody has ever been guilty of capital murder, he sits right here."
Taking into consideration all the evidence presented concerning the actions and statements of the appellant before, during, and after the commission of the crime, we conclude that the prosecutor's comment that the appellant enjoyed committing the crime was a reasonable and legitimate inference to be drawn from the evidence and, thus, was not improper argument. We note that, as the appellant was being taken to jail after making the statement admitting his involvement in the crime, he asked Investigator Harrison if there were photographs of the crime scene showing the body of the victim. Upon being told that there were, he asked if he could see them. The prosecution has a right to present its impression from the evidence, and the evidence in this case supports the impression conveyed by the prosecutor.
 IV.
The appellant next contends that the trial court abused its discretion when it allowed certain photographs[5] of the victim's *Page 907 
body during the autopsy to be admitted into evidence during the sentencing portion of his trial.[6] The photographs were admitted into evidence during the direct examination of Dr. Simmons. Dr. Simmons used photographic slides to illustrate to the jury the victim's injuries. The appellant contends that the exhibits were unduly prejudicial, that they lacked probative value, and that they did not prove or disprove any material issue.
The state has the burden of proving the aggravating circumstance that the crime was "especially heinous, atrocious, or cruel, compared to other capital offenses," § 13A-5-49(8), thus, the exhibits were relevant for that purpose. Hutchersonv. State, 677 So.2d 1174 (Ala.Cr.App. 1994); Bankhead v. State,585 So.2d 97 (Ala.Cr.App. 1989), remanded on other grounds,585 So.2d 112 (Ala.), on remand, 585 So.2d 133 (1991).
 "Generally, photographs are admissible into evidence in a criminal prosecution 'if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge.' Magwood v. State, 494 So.2d 124, 141 (Ala.Cr.App. 1985), aff'd, 494 So.2d 154 (Ala. 1986), cert. denied, 479 U.S. 995
[107 S.Ct. 599, 93 L.Ed.2d 599] . . . (1986). See also Woods v. State, 460 So.2d 291
(Ala.Cr.App. 1984); Washington v. State, 415 So.2d 1175 (Ala.Cr.App. 1982); C. Gamble, McElroy's Alabama Evidence § 207.01 (3d ed. 1977)."
585 So.2d at 109.
We hold that the trial court correctly received the photographs into evidence because they were relevant to prove the existence of this aggravating circumstance.
The appellant further argues that the photographs were cumulative of other photographic evidence and that they failed to shed light upon or illustrate any relevant facts that had not already been shown by the state. This same issue was addressed in Bankhead v. State, in which we held that a subsequent slide presentation during the sentencing phase of the trial is proper so long as it does not distort the facts nor mislead the jury.
 "It has long been the law in Alabama that '[p]hotographs which show the external wounds in the body of a deceased victim, even though they are cumulative and based on undisputed matters, are admissible. The fact that they are gruesome is not grounds to exclude them so long as they shed light on the issues being tried.' Burton v. State, 521 So.2d 91, 92 (Ala.Cr.App. 1987). See also Kinder v. State, 515 So.2d 55 (Ala.Cr.App. 1986). The fact that a photograph is gruesome and ghastly is no reason to exclude it from the evidence, so long as the photograph has some relevancy to the proceedings, even if the photograph may tend to inflame the jury. Magwood v. State, supra, 494 So.2d at 141. See also Hutto v. State, 465 So.2d 1211 (Ala.Cr.App. 1984); Jones v. State, 439 So.2d 776 (Ala.Cr.App. 1983); Godbolt v. State, 429 So.2d 1131 (Ala.Cr.App. 1982).
 "This rule of law applies not only to photographs, but to photographic slides as well. Goffer v. State, 430 So.2d 896 (Ala.Cr.App. 1983)."
585 So.2d at 109.
The appellant also objected to the slide presentation because, he said, "any depiction of the wounds on the slides would grossly exaggerate the wounds and tend to inflame the jury." We find the following from Goffer v. State,430 So.2d 896, 899 (Ala.Cr.App. 1983), to be dispositive of the appellant's assertion: "The slides were just enlargements of photographs and the wounds were shown in relation to the deceased. The slides gave the jury a better understanding of the nature and gravity of the deceased's injuries, and we do not believe the slides *Page 908 
distorted the injuries or misled the jury in any way."
Finally, the appellant argues that "several exhibits failed to portray the deceased's body or evidence in the condition [either was] found." Although the appellant does not, in his brief, specify any exhibit to which he is referring, we note that, contrary to the state's assertion that the appellant did not "raise an objection on this ground at trial," the appellant objected to exhibit no. 76, in part, because the photograph depicted someone's hand, other than the victim's, covered with a black surgical glove and thus was not a photograph of only the wound, but included extrinsic materials. He objected, in part, to exhibit no. 80 because the victim's hair surrounding the wound had been shaved away. He objected to Exhibit Nos. 84 and 85 because those photographs were taken after dissection and thus "most of the injury [depicted in] these pictures was done by the surgical instruments and [the defense] feel[s] like that's highly prejudicial and inflammatory."
The record reflects that, during his explanation of the victim's wounds to the jury, Dr. Simmons carefully and consistently explained the extrinsic objects in the photographs. He informed the jury that they were placed there at the instructions of either police personnel, the deputy coroner, or himself. He further informed the jury of the purpose or function of each of these objects, e.g., that the brown paper wrapped around the handle of the knife which was left embedded in the victim's body served to preserve any possible evidence such as fingerprints and that the plaques with numbers on them were for identification purposes. The extrinsic objects did not distort the wounds in any way.
The remaining objections by the appellant to the introduction of the photographs are meritless:
 " 'The general rule in Alabama is that photographs of a murder victim taken after the performance of surgery or an autopsy are admissible in evidence even though they show the marks of incisions made for the purpose of the autopsy or resulting from the surgery where these marks are sufficiently identified and pointed out to the jury. . . .
 " '. . . The fact that a photograph has very little probative value does not prevent its admissibility where it will tend to shed light on, strengthen, or illustrate the truth of other testimony; or where it has a reasonable tendency to prove or disprove some material fact or issue in the case; or where it illustrates the location, nature or extent of the wound or is used to identify the deceased.' Gilmore v. State, 346 So.2d 1193, 1196 (Ala. 1977)."
Malone v. State, 536 So.2d 123, 125 (Ala.Cr.App. 1988).
In regard to exhibit no. 80, the record reveals that Dr. Simmons explained to the jury that the victim's hair had been shaved at his direction to expose the wounds.
Exhibit Nos. 84 and 85, photographs that showed injuries to the neck allegedly caused by the appellant and which had been taken after the victim's neck had been surgically opened during the autopsy, were admitted to show the specific trauma and hemorrhage inflicted near the backbone. The following is applicable to these photographs:
 " 'A photograph [of a victim] becomes objectionable only when there is distortion of two kinds [, one of which is] distortion of the subject matter as where necrotic or other surgery causes exposure of nonprobative views, e.g., massive mutilation. . . .' C. Gamble, McElroy's Alabama Evidence, § 207.01(2) (3d ed. 1977)."
Malone, 536 So.2d at 125. In regard to these two photographs, although the photographs also showed the injuries inflicted by the autopsy incision to the neck, Dr. Simmons explained to the jury that the "muscles [had been] reflected upwards" and that the cut inflicted by the appellant was superficial. The photographs were relevant to show the location of a specific wound not otherwise shown. Moreover, the jury had already viewed the photographs of the superficial wound on the victim's neck that were taken before the autopsy was performed. The testimony and the photographs made it clear that the condition of the victim's neck as depicted by exhibit nos. 84 and 85 was due, in part, to the autopsy. See Malone. The trial *Page 909 
court did not abuse its discretion in admitting these exhibits into evidence.
 V.
The appellant contends that, during his closing argument to the jury during the sentencing phase of the trial, the prosecutor improperly injected his personal opinions, made disparaging characterizations of the appellant, injected facts not in evidence, appealed to the jury to have sympathy for the victim, and impugned evidence of mitigating circumstances offered by the defense. While the appellant claims that the prosecutor made many improper comments in his closing argument, he mentions only four in his brief.
(1) The appellant claims that the prosecutor's reference to the appellant's "using" people for his own benefit and "using" his children constituted improper argument. The prosecutor argued that the appellant had used the victim for sex and also used his minister and his daughter as witnesses in the sentencing phase to gain sympathy from the jury. We think that this argument was directed to relevant sentencing concerns of the jury and was, therefore, proper. These comments were legitimate inferences that could be drawn from the evidence and were proper responses to arguments by the defense calculated to persuade the jury to sympathize with the appellant's family.
(2) The appellant further contends that the prosecutor's argument that the attack on the victim was a "rape" and his comments that the appellant tortured the victim were improper. We find that these comments were reasonable inferences to be drawn from the evidence and were proper.
(3) He further contends that the prosecutor erred by "screaming in a tirade" at the jury. We have reviewed the prosecutor's argument that the appellant complains of and conclude that it addressed relevant sentencing concerns of the jury and was proper. The fact that an argument is emotional does not alone indict it as improper. We also view this argument as an appeal for justice.
(4) Finally, the appellant contends that the prosecutor impugned the evidence presented by the defense of mitigating circumstances. We do not agree. The prosecutor commented that the only mitigating factor in the appellant's favor was that he had no prior criminal history. This was a legitimate comment on the evidence.
 VI.
The appellant contends that the trial court committed reversible error when it sentenced him to death based on the allegedly erroneous conclusion that the aggravating circumstances outweighed the mitigating circumstances. He argues that the weighing process was improperly conducted and that the trial court did not give sufficient weight to the mitigating circumstances and to the advisory verdict of the jury. We find no merit in this contention. Section 13A-5-47
provides the procedure for the trial court's sentencing determination in a capital case. A review of the record, including the sentencing order of the trial court, discloses that the trial court fully complied with the sentencing statute. The trial court found the existence of two aggravating circumstances and one mitigating circumstance, and after weighing the aggravating and mitigating circumstances and considering the presentence report and the advisory verdict of the jury, the trial court determined that the aggravating circumstances outweighed the mitigating circumstance and sentenced the appellant to death. The sentencing order of the trial court shows that the weighing process was properly conducted and that the mitigating circumstance and the advisory verdict of the jury were considered and weighed. The findings and sentence of the trial court are supported by the evidence. For a more detailed discussion of the aggravating and mitigating circumstances and the weighing thereof, see parts VII through IX of this opinion.
 VII.
The appellant contends that the sentence of death in his case is excessive and disproportionate "considering the case's uniqueness to all other capital convictions involving burglary." He argues again that *Page 910 
the facts do not support a burglary conviction. As we have previously stated in this opinion, we do not agree. The state's evidence was sufficient to support a conviction for burglary in the first degree.
The appellant further argues that the "greater weight of mitigating circumstances . . . clearly outweighed the two aggravating circumstances and justified a sentence of life without parole." Again, we do not agree. We concur in the trial court's judgment that death is the appropriate sentence in this case, that it is strongly supported by the evidence, and that it is not excessive or disproportionate to the penalties imposed in similar cases. See also parts VIII and IX of this opinion.
 VIII.
The appellant contends that § 13A-5-49(8), Ala. Code 1975, which sets out as an aggravating circumstance that the crime "was especially heinous, atrocious or cruel compared to other capital offenses," which aggravating circumstance was found by the trial court to exist in this case, is unconstitutionally vague. He argues that a jury determining the application of this circumstance is not furnished with evidence of other capital offenses with which to compare the offense before it and that the statute fails to provide a method by which the jury could be given guidance or a basis for comparison to aid it in its determination.
The case of Ex parte Bankhead, 585 So.2d 112 (Ala. 1991), is dispositive of this contention. In that case, the Alabama Supreme Court held that in order for the jury to determine whether "[t]he capital offense was especially heinous, atrocious or cruel compared to other capital offenses," it was not necessary that the trial court charge the jury on pertinent facts of "other capital cases." The court held that such a requirement would be confusing to the jury, unduly burdensome to the court, unworkable, and virtually impossible to implement. The court, in reaffirming its standard for determining whether a crime is "especially heinous, atrocious or cruel compared to other capital offenses," stated:
 "This Court has decided upon an approach for the purposes of § 13A-5-49(8). In comparing capital offenses for the purposes of determining whether a capital offense was 'especially heinous, atrocious or cruel,' the court uses the [Ex parte]Kyzer [, 399 So.2d 330 (Ala. 1981),] standard. Capital offenses falling under § 13A-5-49(8) are, pursuant to the Kyzer standard, those 'conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' Kyzer, 399 So.2d at 334."
Id. at 125.
Accordingly, we hold that § 13A-5-49(8) is not facially unconstitutional. See also Bui v. State, 551 So.2d 1094
(Ala.Cr.App. 1988). Moreover, in the instant case, the trial court followed the Kyzer standard in instructing the jury, and its finding that the crime was "especially heinous, atrocious or cruel compared to other capital offenses" was supported by the record and in fact met the Kyzer standard.
 IX.
In accordance with Ala.R.App.P. 45A, we have examined the record in this case for any plain error, whether or not brought to our attention or to the attention of the trial court. We have found no "plain error or defect in the proceedings," either in the guilt phase or in the sentencing phases of the trial.
We have also reviewed the appellant's sentence pursuant to § 13A-5-53, which requires that, in addition to reviewing the case for any error involving the conviction, we shall also review the propriety of the death sentence. This review shall include a determination of the following: (1) whether any error adversely affecting the rights of the appellant was made in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we must determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent *Page 911 
weighing by this court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the appellant.
After the appellant was convicted of the capital offense charged, a separate sentence hearing was held before the jury in accordance with §§ 13A-5-45 and -46. After hearing evidence concerning aggravating and mitigating circumstances, being properly instructed by the trial court as to the applicable law, and being correctly advised as to its function in finding aggravating and mitigating circumstances, to the weighing of those circumstances, if appropriate, and to its responsibility in reference to the return of an advisory verdict; the jury, by a vote of seven to five, returned the following verdict: "We the jury fix the punishment of Joseph Ward Gentry at life imprisonment without parole."
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, to determine whether it would sentence the appellant to death or follow the jury's recommendation and sentence him to life imprisonment without the possibility of parole. The trial court ordered and received a written presentence investigation report, as required by §13A-5-47(b). After the hearing, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in §13A-5-49 and the existence or nonexistence of any mitigating circumstances in § 13A-5-51 and § 13A-5-52, as well as written findings of fact summarizing the crime and the appellant's participation in it. In its findings of fact (attached as an appendix to this opinion), the trial court found the existence of the following aggravating circumstances: (1) that the capital offense was committed while the defendant was engaged in the commission of a burglary, § 13A-5-49(4); and (2) that the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses, § 13A-5-49(8). The trial court examined the evidence for mitigating circumstances, pursuant to §§ 13A-5-51 and -52, and found the existence of one: that the appellant has no significant history of prior criminal activity, § 13A-5-51(1). In fact, the trial court noted that the appellant had no history of prior criminal activity.[7]
Thus, the trial court found the existence of two aggravating circumstances and one mitigating circumstance. It considered the presentence report along with the advisory verdict of the jury and weighed the aggravating circumstances against the mitigating circumstance, and finding that the aggravating circumstances outweighed the mitigating circumstance, sentenced the appellant to death.
The appellant was convicted of the offense of murder committed during a burglary in the first degree, §13A-5-40(a)(2). This offense is defined by statute as a capital offense. We take judicial notice that similar crimes are being punished capitally throughout this state. See, e.g., Ford v.State, 515 So.2d 34 (Ala.Cr.App. 1986), aff'd, 515 So.2d 48
(Ala. 1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1061,98 L.Ed.2d 1023 (1988); Kennedy v. State, 472 So.2d 1092
(Ala.Cr.App. 1984), aff'd, 472 So.2d 1106 (Ala.), cert. denied,474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). See alsoGrayson v. State, 479 So.2d 69 (Ala.Cr.App. 1984), aff'd,479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189,88 L.Ed.2d 157 (1985); Thomas v. State, 539 So.2d 375
(Ala.Cr.App.), aff'd, 539 So.2d 399 (Ala. 1988), cert. denied,491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 709 (1989).
We have carefully searched the record of both the guilt and the sentence phases of the appellant's trial, and we have found no error warranting reversal. In reviewing the sentence, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We *Page 912 
find that the findings and conclusions of the trial court are supported by the evidence. We concur in the judgment of the trial court that death is the appropriate sentence in this case. Our independent weighing of the aggravating circumstances and mitigating circumstance convinces us that the sentence of death is appropriate for this appellant. Considering the premeditated, vicious, and unnecessarily tortuous nature of the crime committed and considering the appellant, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
Accordingly, the appellant's conviction and sentence of death are due to be, and they are hereby, affirmed.
AFFIRMED.
All Judges concur.
 APPENDIX
State of Alabama, Plaintiff,
-vs-
Joseph Ward Gentry, Defendant.
Case No. CC 89-1345
IN THE CIRCUIT COURT OF
JEFFERSON COUNTY, ALABAMA
CRIMINAL DIVISION
 ORDER
This case is a retrial of a case which had previously been tried before this Court and was reversed by the Court of Criminal Appeals because the trial judge allowed the jury to separate over the objection of the appellant in violation of Alabama Code 1975, Section 12-6-9(a).
The Defendant in this case, Joseph Ward Gentry, was charged by an indictment by the Grand Jury of the Circuit Court of the Tenth Judicial Circuit, Jefferson County, for the capital offense of murder during the commission of a burglary in the first degree under Title 13A-5-40(a)(4).
On August 3, 1992, the case came on to be heard before the Court and a jury of fourteen (14) men and women duly empaneled and sworn on that date as required by law.
The jury after hearing the evidence, the Court's charge to the applicable law and upon consideration of the law and the evidence the number of the jury was diminished by two (2) as provided by law, wherein the twelve (12) remaining jurors found the defendant guilty of the capital offense as charged in the indictment. The jury was polled and the verdict was unanimous in finding the defendant guilty of the capital offense. The verdict on the guilt phase of the trial was returned on August 5, 1992 and after the jury verdict was returned the Court, after a short recess, proceeded with the punishment phase of the trial. After brief instructions by the Court as to the procedure to be followed during the sentencing, the sentencing phase began as required by the Supreme Court of the State of Alabama and by Section 13A-5-45 of the Alabama Death Penalty Statute.
After opening statements by the attorneys, their presentation of evidence during the punishment phase of these proceedings and summation by the attorneys the Court again charged the jury as to the applicable law, advising said jury that after hearing evidence concerning aggravating circumstances and mitigating circumstances that the jury would fix punishment according to the law. The Court further charged the jury that if the mitigating circumstances outweigh the aggravating circumstances then the punishment would be fixed at life imprisonment without eligibility for parole but if the aggravating circumstances outweigh the mitigating circumstances then the punishment would be fixed at death. After due deliberation the jury returned a verdict fixing the defendant's punishment at life imprisonment without parole.
The jury was individually polled and the verdict was seven (7) in favor of life imprisonment without parole and five (5) in favor of death.
The Court in its charge to the jury as to how mitigating circumstances and aggravating circumstances would be considered in fixing punishment during the punishment phase, advised the jury that emotion, passion, prejudice or other arbitrary factors should *Page 913 
not be considered in arriving at punishment in the verdict. The Court further charged to the jury that their deliberations and verdicts should be based on the law and on the evidence as they had heard during the course of the trial. The Court is satisfied and makes the finding that the element of passion, prejudice or other arbitrary factors were not present in the jury's deliberation in fixing punishment at life imprisonment without parole. After the jury returned said verdict the Court then announced the jury verdict and set the sentencing date for September 25, 1992 at 8:30 a.m. The sentencing was subsequently continued until October 9, 1992.
 FINDING OF FACTS FROM THE TRIAL
After said hearing the Court makes the following finding of facts from the trial. The victim in this case, Kimberly Diane Hill was a 24 year old female that had worked with the defendant at a local bank. The defendant had worked in a supervisory capacity over the victim and after some period of time working together, the victim and the defendant developed an intimate relationship. During this relationship the victim had given the defendant a set of keys to her apartment and the defendant had apparently used the keys for some period of time prior to January 13, 1989. Approximately two weeks before Christmas of the preceding year the defendant was advised by the victim that she was pregnant by him which caused the defendant much concern as he was presently married with two children of his own. In subsequent conversation with the victim, the defendant advised her that he would divorce his wife and move in with her to raise their child that she was expecting. The defendant further told the victim that he would leave his wife after the Christmas holidays and as soon as he had celebrated his child's birthday in January.
On the date of the murder the defendant and the victim had worked together; however, the defendant left work early that day advising everyone that he was ill and was going home. Instead of going home, the defendant went to the victim's apartment and waited for her to arrive. On her arrival the defendant stated that he surprised the victim and on being surprised she struck him in the chest and as a result a fight between the two parties occurred. During the course of the struggle the victim was severely beaten and stabbed numerous times and was ultimately tied with her hands and feet together and a towel stuffed into the victim's mouth. The defendant further stated that at the time he left the victim in her apartment that she was possibly still alive. The defendant leaving the victim in this condition went to his home and returned to work at his regular shift later that day. When the victim did not arrive at work he stated much concern as to her whereabouts and ultimately caused the victim's mother to go check on her and she found the victim dead in her apartment from the wounds caused by the defendant. In subsequent questioning by police officers the defendant ultimately admitted his participation in the death of the victim.
The coroner/medical examiner testified that the victim was seven (7) weeks pregnant and that the cause of death was multiple blunt force trauma and multiple stab wounds.
 FINDING OF FACTS FROM THE PUNISHMENT HEARING
At the punishment phase before the jury the State requested and was granted a motion that the evidence introduced at trial be incorporated into the punishment phase before the jury. The State at the punishment phase presented additional testimony in the form of exhibits showing the extent of injuries to the victim. He further testified with great detail about the injuries sustained by the victim and further stated that at the autopsy there were several inches of a bath towel that was stuffed inside the victim's mouth at the time that she was received for the autopsy. The defendant presented testimony by several family members and several acquaintances stating as to his good general reputation in the community, his good reputation as a hard worker and further his reputation of being a non-violent person. At the conclusion of this hearing and the summation of the attorneys, the Court again charged the jury as to the applicable law. The Court enumerated the aggravating circumstances *Page 914 
to be the burglary in the first degree and the intentional killing of the victim during the commission of a burglary in the first degree as set out in Section 13A-5-40(a)(4) and that the capital offense was especially heinous, atrocious and cruel compared to other capital offenses as set out in Section13A-5-49. The Court further charged on all the statutory mitigating circumstances as set out in Title 13A-5-51 and informed the jury that they were not bound by only the statutory mitigating circumstances but may consider any other circumstances in mitigation. The Court further charged to thejury that in determining the punishment the jury must avoid anyinfluence of passion, prejudice or any other arbitrary factors.
The Court further charged to the jury that in determining the punishment the jury must avoid any influence of passion, prejudice or any other arbitrary factors. The Court further charged that the burden on the State was to prove the aggravating circumstances beyond a reasonable doubt and to a moral certainty; however, the mitigating circumstances need only be proven by the defendant to the jury's reasonable satisfaction. The Court further charged the jury that it was not the numerical number of aggravating circumstances as opposed to the number of mitigating circumstances or the number of mitigating circumstances as opposed to the aggravating circumstances but the seriousness or the gravity of the aggravating circumstances and the mitigating circumstances proven to the jury's reasonable satisfaction.
The jury, after due deliberation, affixed punishment at life imprisonment without parole and the Court on questioning the jury individually, determined that the vote of the jury was seven (7) in favor of life imprisonment without parole and five (5) in favor of death. The Court further makes the finding in fixing the punishment that the jurors were not influenced by passion, prejudice or any other arbitrary factors.
 FINDING OF FACTS FROM THE SENTENCE HEARING BY THE COURT
On this the 30th day of October, 1992, the defendant, Joseph Ward Gentry, coming into Court with his counsel, Hon. William Delgrosso, Hon. Jonathan Tindle and the Deputy District Attorneys Roger A. Brown and Jeffrey Wallace. This Court having been the trial Court and having heard all testimony in this matter adopts all evidence previously presented in the "guilty phase" of the proceedings in the "sentencing phase", both proceedings being held before the Court and the evidence presented before the jury in both hearings is incorporated in this hearing to be considered by the Court in fixing punishment.
No additional testimony was presented by either the attorneys for the state or the attorneys for the defendant at the sentencing hearing before the Court, but attorney William Delgrosso addressed the Court concerning the weight of the mitigating versus aggravating circumstances for the defense and Deputy District Attorney Roger Brown addressed aggravating versus mitigating circumstances for the state. The Court further considers statements by counsel both by the defense and by the state and weighs statements in consideration in fixing punishment in this case.
 AGGRAVATING CIRCUMSTANCES
This Court finds as an aggravating circumstance the component portions of the capital offense wherein the victim, Kimberly Diane Hill, was intentionally killed by the defendant during the commission of a burglary in the first degree. The Court finds as a second aggravating circumstance that the crime was especially heinous, atrocious or cruel compared to other capital offenses as set out in Title 13A-5-49(8).
The Court further finds that the capital offense was not committed while the defendant was under sentence of imprisonment; therefore, 13A-5-49(1) does not apply.
The Court further finds that the defendant was not previously convicted of any other capital offense or any other felony involving the use of a threat of violence to the person; therefore, 13A-5-49(2) does not apply. *Page 915 
The Court further finds that the defendant did not knowingly create a great risk of death to many persons; therefore,13A-5-49(3) does not apply.
The Court has previously enumerated that the capital offense was committed while the defendant was engaged in the commission of a burglary in the first degree; therefore, this aggravating circumstance under 13A-5-49(4) is present as herein before stated in this sentencing order.
The Court further finds that the capital offense was not committed for the purposes of avoiding or preventing a lawful arrest or effecting an escape from custody; therefore,13A-5-49(5) does not apply.
The Court further finds that the capital offense was not committed for pecuniary gain; therefore, 13A-5-49(6) does not apply.
The Court further finds that the capital offense was not committed to disrupt or hender the lawful exercise of any government function or the enforcement of laws; therefore,13A-5-49(7) does not apply.
The aggravating circumstances as herein-before set out in this sentencing order, to-wit: being the component portions of the capital offense, being the commission of a capital offense during the commission of a burglary in the first degree as set out in 13A-5-49(4) and that the capital offense was especially heinous, atrocious or cruel compared to other capital offenses as set out in 13A-5-49(8) have both been proven to the Court and the Court does find that the aggravating circumstances were proven beyond a reasonable doubt.
These two (2) aggravating circumstances are the only aggravating circumstances in aggravation considered against the defendant, Joseph Ward Gentry.
 MITIGATING CIRCUMSTANCES
The Court does find that several mitigating circumstances were present and will address those as numerically set out in13A-5-51 of the Alabama Criminal Code.
The Court does find that the defendant does not have any significant history of prior criminal activity and further the Court finds that there is no history of prior criminal activity by the defendant; therefore, mitigating circumstance no.13A-5-51(1) is present and thus considered by the Court.
The Court finds that the capital offense was not committed while the defendant was under the influence of extreme mental or emotional disturbance; therefore, this mitigating circumstance as set out in 13A-5-51(2) is not present.
The victim was not a participant in the defendant's conduct or consented to it; therefore, the mitigating circumstance as set out in 13A-5-51(3) is not present.
The Defendant was not an accomplice in the capital offense committed by another person and his participation was not relatively minor; therefore, the mitigating circumstance as set out in 13A-5-51(4) is not present.
The defendant did not act under extreme duress or under the substantial domination of another party; therefore, mitigating circumstance as set out in 13A-5-51(5) is not present.
The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired; therefore, the mitigating circumstance as set out in 13A-5-51(6) is not present.
The Court did not consider the age of the defendant at the time of the crime to be a mitigating circumstance as Mr. Gentry, at the time of the commission of the offense, was approximately 29 years of age; therefore, mitigating circumstance as set out in 13A-5-51(7) is not present.
The Court in consideration of all the testimony heard before the Court and exhibits introduced in evidence has examined for the presence of any other mitigating circumstances on behalf of the defendant and finds that there are no additional mitigating circumstances present.
The Court has carefully weighed the aggravating and mitigating circumstances which it finds to exist in this case and has given consideration to the recommendations *Page 916 
of the jury contained in its advisory verdict. Title 13A-5-47
places the determination of sentence in a capital case on the Court and requires that the Court consider said aggravating and mitigating circumstances along with any other circumstances in mitigation which the Court heard during the course of the trial. In addition to aggravating and mitigating circumstances the Court has considered, as required, the pre-sentence report previously prepared by the probation office in setting punishment. The advisory verdict rendered by the jury is one of the many facts to be considered and weighed against all other facts and circumstances and while the mitigating circumstances and the jury's recommendation of life without parole have weighed heavy in the Court's consideration it is the judgment of this Court that they are outweighed by the aggravating circumstances of this crime.
IT IS, HEREBY ORDERED, ADJUDGED AND DECREED that the punishment of the Defendant is hereby affixed at death. A formal sentencing entry is hereby attached by separate order.
DONE this the 6th day of November, 1992.
 /s/ James S. Garrett
James S. Garrett Circuit Judge
[1] "The decision of the jury to return an advisory verdict recommending a sentence of life imprisonment without parole must be based on a vote of a majority of the jurors. The decision of the jury to recommend a sentence of death must be based on a vote of at least 10 jurors." Ala. Code 1975, §13A-5-46(f).
[2] This appeal is from the second trial of this case. In the first trial, the jury returned a verdict of guilty of the capital offense charged and recommended the imposition of the death penalty. The trial court accepted the recommendation and sentenced the appellant to death. On appeal, we reversed the conviction and remanded the case because the trial court allowed the jury to separate over the appellant's objections and in violation of § 12-16-9(a). Gentry v. State,595 So.2d 548 (Ala.Cr.App. 1991), cert. denied,595 So.2d 548 (Ala. 1992).
[3] While neither party has questioned whether the appellant was in custody at the time the Miranda warnings were given, we conclude that he was. There had been no formal arrest; however, in view of the circumstances existing at that time, a reasonable person would have believed that he was not free to leave. Smith v. State, 623 So.2d 382 (Ala.Cr.App.), cert. denied, 623 So.2d 382 (Ala. 1993).
[4] While we have followed the holdings of the United States Courts of Appeals for the Fifth and Eleventh Circuits in considering equivocal invocations of the right to counsel, we note that the United States Supreme Court, in the recent case of Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350,129 L.Ed.2d 362 (1994), adopted a different rule, holding that after a knowing and voluntary waiver of Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney.
[5] We note that the photographic slides were not admitted into evidence. Instead, photographs, which are duplicates of the slides, were received into evidence and are a part of the record.
[6] This court briefly addressed this issue on the appeal of Gentry's first trial, wherein we stated,
 "The admission of photographs of the victim's wounds should be governed by the principles set out in Ex parte Bankhead, 585 So.2d 112 (Ala. 1991)." 595 So.2d at 553.
[7] In its sentencing order, the trial court generally referred to having found several mitigating circumstances. However, in reading the court's order in its entirety, particularly its specific findings in regard to the existence or nonexistence of each statutory mitigating circumstance and of any other mitigating evidence, we conclude that the trial court found the existence of only one mitigating circumstance that the appellant had no history of prior criminal activity. Any apparent inconsistencies are obviously typographical mistakes.